**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| STRYKER CORPORATION and STRYKER SALES, LLC, | |
| Plaintiffs, | Case No. _____-_____ |
| v. | **JURY TRIAL DEMANDED** |
| FERNO-WASHINGTON, INC. and FERNO GROUP, INC., | |
| Defendants | |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiffs Stryker Corporation ("Stryker") and Stryker Sales, LLC ("Stryker Sales") (collectively, "Plaintiffs" or the "Stryker Plaintiffs") complain and allege as follows against Defendants, Ferno-Washington, Inc., d/b/a Ferno ("Ferno") and Ferno Group, Inc. ("Ferno Group") (collectively, "Defendants" or the "Ferno Defendants"):

**INTRODUCTION**

1.      The Stryker Plaintiffs are a global leader in medical technologies. The Stryker Plaintiffs are a market leader in design, development, manufacture, sale, and/or distribution of a variety of medical devices, systems, and instruments, such as ambulatory cots and cot fasteners. Stryker offers innovative products and services in numerous medical fields that help improve patient and hospital outcomes, including ambulatory cots and cot fasteners.

2.      Stryker Sales distributes and sells many of Stryker's products in the United States, including ambulatory cots and cot fasteners.

3.      The United States Patent and Trademark Office has awarded Stryker numerous patents covering its inventions relating to ambulatory cots and cot fasteners, including: (a) U.S.

Patent No. 7,398,571 (the "571 Patent"); (b) U.S. Reissue Patent No. 44,884 (the "884 Reissue Patent"); (c) U.S. Patent No. 7,725,968 (the "968 Patent"); (d) U.S. Patent No. 8,056,950 (the "950 Patent"); (e) U.S. Patent No. 10,058,464 (the "464 Patent"); (f) U.S. Design Patent No. D794,205 (the "205 Design Patent"); (g) U.S. Design Patent No. D833,623 (the "623 Design Patent"); and (h) U.S. Design Patent No. D875,950 (the "950 Design Patent") (collectively, the "Asserted Patents").

4.      The Asserted Patents are valid, enforceable and currently in full force and effect.

5.      This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code, 35 U.S.C. § 100, *et seq*. Defendants have infringed and continue to infringe, either literally or under the doctrine of equivalents, one or more claims of the Asserted Patents in violation of 35 U.S.C. § 271. Defendants' infringement will continue unless enjoined by this Court.

6.      The Stryker Plaintiffs bring this action to stop Defendants from infringing the Asserted Patents, which protect various aspects of Stryker's innovative ambulatory cots and cot fasteners.

## THE PARTIES

7.      Stryker is corporation organized and existing under the laws of the State of Michigan, with a principal place of business at 2825 Airview Boulevard, Kalamazoo, Michigan 49002. Stryker owns all right, title, and interest in and to the Asserted Patents.

8.      Stryker Sales is a corporation organized and existing under the laws of the State of Michigan, with its principal place of business at 2825 Airview Boulevard, Kalamazoo, Michigan 49002. Stryker Sales holds an exclusive license under the Asserted Patents to distribute and sell certain Stryker products in the United States, including but not limited to the Power-PRO XT

ambulance cot, Performance-PRO XT ambulance cot, Power-PRO 2 ambulance cot, and Performance-LOAD cot fastener.

9.      Ferno Group is a corporation organized under the laws of Ohio, with its headquarters at 70 Weil Way, Wilmington, OH 45177.

10.     Ferno is a corporation organized under the laws of Ohio, with its headquarters at 70 Weil Way, Wilmington, OH 45177. On information and belief, Ferno is wholly owned by Ferno Group.

11.     The Ferno Defendants directly or indirectly develop, design, manufacture, use, distribute, market, offer to sell, and/or sell products in the United States, including ambulatory cots and cot fasteners.

## JURISDICTION AND VENUE

12.     This action arises under the Patent Laws of the United States, 35 U.S.C. § 1, *et seq*., which are within the subject matter jurisdiction of this federal district court under 28 U.S.C. §§ 1331 and 1338(a).

13.     Defendants are subject to personal jurisdiction in this District based upon their formation under the laws of the State of Ohio, their transaction of business in this District, and their use, marketing, distributing, offering for sale, and/or sales of infringing systems, devices and instruments, which has caused the Stryker Plaintiffs harm in this District.

14.     Venue is proper in this District under 28 U.S.C. §§ 1391(b), (c), and/or 1400(b) at least because Defendants reside in this District, and are subject to personal jurisdiction in this District.

## FACTUAL BACKGROUND

15.     Emergency Medical Services (EMS) personnel face myriad challenges on the job every day, particularly during emergency responses. For example, EMS personnel are at risk of

suffering career-ending back injuries triggered by lifting ambulatory cots. Once a cot is placed in the ambulance by EMS personnel, it is also important to protect the patient, EMS personnel, or other caregivers by safely guiding and securing the cot to an ambulance during an emergency response. For at least these reasons, ease of loading functionality and cot weight are consistently ranked as important factors in an ambulance cot and/or cot fastener system.

16.     The Stryker Plaintiffs have developed innovative ambulance cot and cot fastener systems, including the Power-PRO XT ambulance cot, Performance-PRO XT ambulance cot, Power-PRO 2 ambulance cot, Performance-LOAD cot fastener, and other ambulatory systems ("Stryker Ambulatory Products"). Exemplary images of these Stryker Ambulatory Products are depicted below.



**Power-PRO XT Ambulance Cot**

4



**Performance-PRO XT Ambulance Cot**



**Power-PRO 2 Ambulance Cot**



**Performance-LOAD Cot Fastener**

17.　　As a result of its persistent innovation, Stryker was awarded numerous patents by patent offices around the world relating to its novel Stryker Ambulatory Products.

18.　　On July 15, 2008, the United States Patent and Trademark Office ("USPTO") duly and lawfully issued to Stryker, as assignee, the 571 Patent, which is entitled "*Ambulance Cot And Hydraulic Elevating Mechanism Therefor.*" A true and correct copy of the 571 Patent is attached as Exhibit A hereto.

19.　　On May 13, 2014, the USPTO duly and lawfully reissued to Stryker, as assignee, U.S. Patent No. 7,540,047 as the 884 Reissue Patent, which is entitled "*Ambulance Cot With Pinch Safety Feature.*" A true and correct copy of the 884 Reissue Patent is attached as Exhibit B hereto.

20.　　On June 1, 2010, the USPTO duly and lawfully issued to Stryker, as assignee, the 968 Patent, which is entitled "*Ambulance Cot With Retractable Head Section And Control System Therefor.*" A true and correct copy of the 968 Patent is attached as Exhibit C hereto.

21.　　On November 15, 2011 the USPTO duly and lawfully issued to Stryker, as assignee, the 950 Patent, which is entitled "*In-Ambulance Cot Shut-Off Device.*" A true and correct copy of the 950 Patent is attached as Exhibit D hereto.

22.　　On August 28, 2018, the USPTO duly and lawfully issued to Stryker, as assignee, the "464 Patent", which is entitled "*Cot Fastening System.*" A true and correct copy of the 464 Patent is attached as Exhibit E hereto.

23.　　On August 8, 2017 the USPTO duly and lawfully issued to Stryker, as assignee, the 205 Design Patent, which is entitled "*Cot Fastener.*" A true and correct copy of the 205 Design Patent is attached as Exhibit F hereto.

24. On November 13, 2018, the USPTO duly and legally issued to Stryker, as assignee, the 623 Design Patent, which is entitled "*Cot Fastener*." A true and correct copy of the 623 Design Patent is attached as Exhibit G hereto.

25. On February 18, 2020, the USPTO duly and legally issued to Stryker, as assignee, the 950 Design Patent, which is entitled "*Cot Fastener*." A true and correct copy of the 950 Design Patent is attached as Exhibit H hereto.

26. Stryker is the owner by assignment of all right, title and interest in and to the Asserted Patents as assignee.

27. Defendants' business is focused on medical and emergency care products, including ambulatory cots, patient transfer devices, and cot fastening devices.

28. Defendants market the POWER X1 Ambulance Cot ("X1 Cot"), the iNX Integrated Patient Transport & Loading System ("iNX Cot"), and the PRO F1 Universal Cot Fastener ("F1 Fastener") (collectively, the "Accused Products"), which are depicted below. On information and belief, the Defendants have earned profits by virtue of their commercialization of the Accused Products.



**<u>X1 Cot</u>**



**iNX Cot**



**F1 Fastener**

29.     Defendants provide instructions to third parties including customers, such as hospitals, EMS providers, and EMS personnel, on how to use the Accused Products with various publications such as sale sheets, user manuals, and the like, which are available on Ferno's website at www.ferno.com.

30.     Certain promotional materials, manuals, and photographs for the X1 Cot, the iNX Cot, and the F1 Fastener are attached to this Complaint, including: the X1 Cot sales sheet at Exhibit I1 ("X1 Sheet"); the X1 Cot sales brochure at Exhibit I2 ("X1 Brochure", collectively with the X1 Sheet, the "X1 Literature"); the iNX Cot sales sheet at Exhibit J1 ("iNX Sheet"); the iNX Cot sales

brochure at Exhibit J2 ("iNX Brochure"); the iNX Cot user manual at Exhibit J3 ("iNX Manual", collectively with the iNX Sheet and iNX Brochure, the "iNX Literature"); the F1 Fastener sales sheet at Exhibit K1 ("Fastener Sheet"); the F1 Fastener user manual at Exhibit K2 ("Fastener Manual", collectively with the Fastener Sheet, the "Fastener Literature").

31.     Defendants, directly and/or indirectly, manufacture, market, offer for sale, sell, use, and/or distribute in the United States ambulatory cots and cot fasteners, which, alone or together, infringe the Asserted Patents, including, without limitation, the X1 Cot, the iNX Cot, and the F1 Fastener.

32.     On information and belief, at all relevant times to this action, Defendants knew of and/or were willfully blind to the Asserted Patents. For example, Defendants referenced the Asserted Patents and various other Stryker patents related to the Asserted Patents during prosecution of Defendants' own patent applications related to ambulatory cots and cot fasteners.

33.     In addition, on information and belief, at least one former Stryker employee has been and/or is employed by Defendants, including at least one employee associated with the ambulatory cot division. Such former at least one Stryker employee had knowledge of Stryker's products and one or more of the Asserted Patents and related patents covering the Stryker Ambulatory Products, which was gained through their employment by Stryker. For example, on information and belief, Defendants' vice president of global marketing and product development was formerly a group marketing manager at Stryker and is named as an inventor on the 571 Patent. Such at least one employee would have knowledge of the Stryker Ambulatory Products and one or more of the Asserted Patents and related patents covering the Stryker Ambulatory Products while employed by Stryker.

34.     Other facts further indicate Defendants had knowledge of the Asserted Patents. Stryker and Defendants are direct and active competitors. The Asserted Patents are also identified on Stryker's virtual patent marking page on Stryker's website (https://www.stryker.com/us/en/about/patents.html) under "medical products" for the various Stryker Ambulatory Products. And finally, Defendants have additional knowledge of the Asserted Patents upon receipt of this complaint. In addition, Defendants advertise certain of the Accused Products as "cross-compatible" with one of more of the Stryker Ambulatory Products.

> The POWER X1 is cross-compatible, as it is designed for use with both FERNO ® and Stryker ® cot fastening systems. It is compatible with the PRO F1 ™ Universal Cot Fastener, Stryker Performance-LOAD ®, and FERNO and Stryker antler-and-rail fasteners.

(Ex. L, Cross-Compatibility Sheet, at 2.)

35.     The Stryker Plaintiffs have suffered, and continue to suffer, damages as a result of Defendants' infringement of the Asserted Patents.

## FIRST CAUSE OF ACTION
### (Infringement of U.S. 7,398,571)

36.     The Stryker Plaintiffs incorporate the foregoing paragraphs by reference as though set forth fully herein.

37.     Defendants have directly infringed, and continue to directly infringe, literally or under the doctrine of equivalents, at least claims 1-2, 5-10, and 14 of the 571 Patent by making, using, offering to sell, and/or selling within the United States, and/or by importing into the United States, certain products, including but not limited to the X1 Cot and the iNX Cot, and induced infringement, pursuant to 35 U.S.C. § 271(b), and/or contributed to infringement, pursuant to 35 U.S.C. § 271(c), of the 571 Patent by others, including customers, such as hospitals, EMS providers, and EMS personnel.

38.     For example, on information and belief, the X1 Cot and the iNX Cot meet every limitation, literally or under the doctrine of equivalents, of at least claims 1-2, 5-10, and 14 of the 571 Patent, and Defendants' making, using, offering for sale, selling and/or importing into the United States the X1 Cot and the iNX Cot directly infringes at least claims 1-2, 5-10, and 14 of the 571 Patent pursuant to 35 U.S.C. § 271(a).

## X1 Cot

39.     The Stryker Plaintiffs provide the following examples to show that Defendants' X1 Cot infringes claims 1-2, 5-10, and 14 of the 571 Patent.

40.     Claim 1 of the 571 Patent recites:

1. An ambulance cot, comprising:

a base frame;

a litter frame; and

an elevating mechanism interconnecting said base frame and said litter frame and being configured to effect changes in elevation of said litter frame relative to said base frame, said elevating mechanism being configured to detect a presence and an absence of a force urging a change in elevation of said litter frame relative to said base frame to thereby cause said base frame and said litter frame to become oriented closer together.

41.     The X1 Cot is an ambulance cot that includes "a base frame; a litter frame; and an elevating mechanism interconnecting said base frame and said litter frame and being configured to effect changes in elevation of said litter frame relative to said base frame." For example, the X1 Literature depicts and instructs:



(Ex. I1, X1 Sheet, at 1; *see also* Ex. I2, X1 Brochure, at 1.)

> The **POWER X1 Ambulance Cot** offers more power, stability, maneuverability, and speed than the leading competitive powered cot.
>
> With an unassisted lift capacity of 700 lb, the POWER X1 is the ultimate solution for both everyday and bariatric transport. Its industry-leading battery technology provides high-powered, reliable performance on every call. The POWER X1 is cross-compatible, as it can be used with a range of fastener systems.

(Ex. I1, X1 Sheet, at 1; *see also* Ex. I2, X1 Brochure, at 1.)

- **700 lb unassisted lift capacity** reduces the strain of everyday and bariatric transport

(Ex. I1, X1 Sheet, at 2; *see also* Ex. I2, X1 Brochure, at 2.)

- **Programmable load height** adjusts to match the height of your ambulance floor

(Ex. I1, X1 Sheet, at 2; *see also* Ex. I2, X1 Brochure, at 2.)

42.     The X1 Cot includes an "elevating mechanism being configured to detect a presence and an absence of a force urging a change in elevation of said litter frame relative to said base frame to thereby cause said base frame and said litter frame to become oriented closer together." For example, the X1 Literature depicts and instructs:

## 40% more SPEED



(Ex. I1, X1 Sheet, at 1; *see also* Ex. I2, X1 Brochure, at 1.)



**RAPIDLift Retraction System**
achieves one full cycle in just 3.4
seconds.

(Ex. I1, X1 Sheet, at 1; *see also* Ex. I2, X1 Brochure, at 1.)

43. The elevating mechanism of the X1 Cot includes a detection device (e.g., a contact sensor) to detect a presence and an absence of a force as claimed. For example, the detection device determines whether the X1 Cot is supported by the ground such that the leg retraction speed is increased when the X1 Cot is not supported by the ground to, for example, facilitate loading into an ambulance.



44. Claim 2 of the 571 Patent recites:

> 2. An ambulance cot comprising:
>
> a base frame and a litter frame;
>
> a deployment mechanism interconnecting said base frame and said litter frame and being configured to effect changes in distance between said litter frame and said base frame, said deployment mechanism having a detection device configured to detect a presence and an absence of a force urging a change in distance between said litter frame and said base frame to cause said base frame and said litter frame to become oriented closer together; and
>
> a control mechanism on said ambulance cot, said control mechanism including a manually operable device for controlling said deployment mechanism, said control mechanism being configured to effect a rapid movement of said deployment mechanism in response to said detection device detecting an absence of said force and in response to an operation of said manually operable device, whereby when said ambulance cot is lifted away from a support surface, causing said detection device to detect an absence of said force, and said manually operable device, is operated, said base frame will be rapidly drawn toward said litter frame by said deployment mechanism.

45. The X1 Cot is an ambulance cot that includes "a base frame and a litter frame; [and] a deployment mechanism interconnecting said base frame and said litter frame and being configured to effect changes in distance between said litter frame and said base frame." For example, the X1 Literature depicts and instructs:



(Ex. I1, X1 Sheet, at 1; *see also* Ex. I2, X1 Brochure, at 1.)

The **POWER X1 Ambulance Cot** offers more power, stability, maneuverability, and speed than the leading competitive powered cot.

With an unassisted lift capacity of 700 lb, the POWER X1 is the ultimate solution for both everyday and bariatric transport. Its industry-leading battery technology provides high-powered, reliable performance on every call. The POWER X1 is cross-compatible, as it can be used with a range of fastener systems.

(Ex. I1, X1 Sheet, at 1; *see also* Ex. I2, X1 Brochure, at 1.)

- **700 lb unassisted lift capacity** reduces the strain of everyday and bariatric transport

(Ex. I1, X1 Sheet, at 2; *see also* Ex. I2, X1 Brochure, at 2.)

- **Programmable load height** adjusts to match the height of your ambulance floor

(Ex. I1, X1 Sheet, at 2; *see also* Ex. I2, X1 Brochure, at 2.)

46.     The X1 Cot includes a "deployment mechanism having a detection device configured to detect a presence and an absence of a force urging a change in distance between litter frame and said base frame to cause said base frame and said litter frame to become oriented closer together."

47.     The elevating mechanism of the X1 Cot includes a detection device (e.g., a contact sensor) to detect a presence and an absence of a force as claimed. For example, the detection device determines whether the X1 Cot is supported by the ground such that the leg retraction speed is increased when the X1 Cot is not supported by the ground to, for example, facilitate loading into an ambulance.



48.     The X1 Cot includes a "control mechanism on said ambulance cot, said control mechanism including a manually operable device for controlling said deployment mechanism, said control mechanism being configured to effect a rapid movement of said deployment mechanism in response to said detection device detecting an absence of said force and in response to an operation of said manually operable device, whereby when said ambulance cot is lifted away from a support surface, causing said detection device to detect an absence of said force, and said manually operable device, is operated, said base frame will be rapidly drawn toward said litter frame by said deployment mechanism."

49.     Defendants' promotional video posted to YouTube titled "RAPIDLift Retraction System" ("X1 Video")[1] demonstrates the high-speed leg retraction and extension of the RAPIDLift Retraction System. Further, the speed at which the X1 Cot retracts when the litter frame is supported by an external support separate from said elevating mechanism (i.e., off the ground) is faster than the speed when the base frame is supported on the surface (e.g., the ground).

---

[1] https://www.youtube.com/watch?v=yZC_ulbfp8Q (last accessed October 10, 2022)



(X1 Video, at 0:36.)



(X1 Video, at 0:38.)



(X1 Video, at 0:43.)

50. Claim 5 of the 571 Patent recites:

5. An ambulance cot, comprising:

a base frame configured for support on a surface;

a litter frame configured for supporting thereon a patient;

an elevating mechanism interconnecting said base frame and said litter frame and being configured to interconnect said litter frame and said base frame in order to facilitate movement of said base frame and said litter frame toward and away from each other; and

a control mechanism on said cot configured to facilitate said movement of said base frame and said litter frame toward each other and at differing speeds predicated on at least one of whether said base frame is supported on said surface and said litter frame is supported by an external support separate from said elevating mechanism.

51.     The X1 Cot is an ambulance cot that includes "a base frame configured for support on a surface; a litter frame configured for supporting thereon a patient; [and] an elevating mechanism interconnecting said base frame and said litter frame and being configured to interconnect said litter frame and said base frame in order to facilitate movement of said base frame and said litter frame toward and away from each other." For example, the X1 Literature depicts and instructs:



(Ex. I1, X1 Sheet, at 1; *see also* Ex. I2, X1 Brochure, at 1.)

The **POWER X1 Ambulance Cot** offers more power, stability, maneuverability, and speed than the leading competitive powered cot.

With an unassisted lift capacity of 700 lb, the POWER X1 is the ultimate solution for both everyday and bariatric transport. Its industry-leading battery technology provides high-powered, reliable performance on every call. The POWER X1 is cross-compatible, as it can be used with a range of fastener systems.

(Ex. I1, X1 Sheet, at 1; *see also* Ex. I2, X1 Brochure, at 1.)

- **700 lb unassisted lift capacity** reduces the strain of everyday and bariatric transport

(Ex. I1, X1 Sheet, at 2; *see also* Ex. I2, X1 Brochure, at 2.)

- **Programmable load height** adjusts to match the height of your ambulance floor

(Ex. I1, X1 Sheet, at 2; *see also* Ex. I2, X1 Brochure, at 2.)

52.     The X1 Cot includes a "control mechanism on said cot configured to facilitate said movement of said base frame and said litter frame toward each other and at differing speeds predicated on at least one of whether said base frame is supported on said surface and said litter frame is supported by an external support separate from said elevating mechanism."

53.     As indicated above, the X1 Video demonstrates the high-speed leg retraction and extension of the X1 Cot's RAPIDLift Retraction System. Further, the speed at which the X1 Cot retracts when the litter frame is supported by an external support separate from said elevating mechanism (i.e., off the ground) is faster than the speed when the base frame is supported on the surface (e.g., the ground).



(X1 Video, at 0:36.)



(X1 Video, at 0:38.)



(X1 Video, at 0:43.)

54.    Claim 6 of the 571 Patent recites: "The ambulance cot according to claim 5, wherein said control mechanism is configured such that when said base frame is supported on said surface,

said control mechanism controls said elevating mechanism to move said litter frame toward said base frame at a preselected speed."

55.     The X1 Cot includes the "ambulance cot according to claim 5" as explained above. The X1 Cot also includes or otherwise provides that "said control mechanism is configured such that when said base frame is supported on said surface, said control mechanism controls said elevating mechanism to move said litter frame toward said base frame at a preselected speed."

56.     As indicated above, the X1 Video demonstrates the high-speed leg retraction and extension of the X1 Cot's RAPIDLift Retraction System. Further, the speed at which the X1 Cot retracts when the litter frame is supported by an external support separate from said elevating mechanism (i.e., off the ground) is faster than the speed (i.e., the preselected speed) when the base frame is supported on the surface (e.g., the ground).

57.     Claim 7 of the 571 Patent recites: "The ambulance cot according to claim 5, wherein said control mechanism is configured such that when said litter frame is supported by the external support separate from said elevating mechanism, said control mechanism controls said elevating mechanism to move said base frame toward said litter frame at a pre-selected speed."

58.     The X1 Cot includes the "ambulance cot according to claim 5" as explained above. The X1 Cot also includes or otherwise provides that "said control mechanism is configured such that when said litter frame is supported by the external support separate from said elevating mechanism, said control mechanism controls said elevating mechanism to move said base frame toward said litter frame at a pre-selected speed."

59.     As indicated above, the X1 Video demonstrates the high-speed leg retraction and extension of the X1 Cot's RAPIDLift Retraction System. Further, the speed (i.e., the pre-selected speed) at which the X1 Cot retracts when the litter frame is supported by an external support

separate from said elevating mechanism (i.e., off the ground) is faster than the speed when the base frame is supported on the surface (e.g., the ground).

60. Claim 8 of the 571 Patent recites:

8. The ambulance cot according to claim 5, wherein said control mechanism is configured such that when said base frame is supported on said surface, said control mechanism controls said elevating mechanism to move said litter frame toward said base frame at a first speed; and

wherein said control mechanism is additionally configured such that when said litter frame is supported by the external support separate from said elevating mechanism, said control mechanism controls said elevating mechanism to move said base frame toward said litter frame at a second speed.

61. The X1 Cot includes the "ambulance cot according to claim 5" as explained above. The X1 Cot also includes or otherwise provides that "wherein said control mechanism is configured such that when said base frame is supported on said surface, said control mechanism controls said elevating mechanism to move said litter frame toward said base frame at a first speed [and] wherein said control mechanism is additionally configured such that when said litter frame is supported by the external support separate from said elevating mechanism, said control mechanism controls said elevating mechanism to move said base frame toward said litter frame at a second speed."

62. As indicated above, the X1 Video demonstrates the high-speed leg retraction and extension of the X1 Cot's RAPIDLift Retraction System. Further, the speed (i.e., second speed) at which the X1 Cot retracts when the litter frame is supported by an external support separate from said elevating mechanism (i.e., off the ground) is faster than the speed (i.e., first speed) when the base frame is supported on the surface (e.g., the ground).

63. Claim 9 of the 571 Patent recites: "The ambulance cot according to claim 8, wherein said first and second speeds are each pre-selected and said second preselected speed is significantly different than said first pre-selected speed."

64. The X1 Cot includes the "ambulance cot according to claim 8" as explained above. The X1 Cot also includes or otherwise provides that "said first and second speeds are each pre-selected and said second preselected speed is significantly different than said first pre-selected speed."

65. As indicated above, the X1 Video demonstrates the high-speed leg retraction and extension of the X1 Cot's RAPIDLift Retraction System. Further, the speed (i.e., second speed) at which the X1 Cot retracts when the litter frame is supported by an external support separate from said elevating mechanism (i.e., off the ground) is faster than the speed (i.e., first speed) when the base frame is supported on the surface (e.g., the ground).

66. Claim 10 of the 571 Patent recites: "The ambulance cot according to claim 8, wherein said second speed is greater than said first speed."

67. The X1 Cot includes the "ambulance cot according to claim 8" as explained above. The X1 Cot also includes or otherwise provides that "said second speed is greater than said first speed."

68. As indicated above, the X1 Video demonstrates the high-speed leg retraction and extension of the X1 Cot's RAPIDLift Retraction System. Further, the speed (i.e., second speed) at which the X1 Cot retracts when the litter frame is supported by an external support separate from said elevating mechanism (i.e., off the ground) is faster than the speed (i.e., first speed) when the base frame is supported on the surface (e.g., the ground).

69.     Claim 14 of the 571 Patent recites: "The ambulance cot according to claim 5, wherein the external support is provided by an attendant lifting up on said litter frame."

70.     The X1 Cot includes the "ambulance cot according to claim 5" as explained above. The X1 Cot also includes or otherwise provides that "the external support is provided by an attendant lifting up on said litter frame." For example, as can be seen from the X1 Video:



(X1 Video, at 0:38.)

### iNX Cot

71.     Similarly, the Stryker Plaintiffs provide the following examples to show that Defendants' iNX Cot infringes claims 1-2, 5-10, and 14 of the 571 Patent.

72.     Claim 1 of the 571 Patent recites:

1. An ambulance cot, comprising:

a base frame;

a litter frame; and

an elevating mechanism interconnecting said base frame and said litter frame and being configured to effect changes in elevation of said litter frame relative to said base frame, said elevating mechanism being configured to detect a presence and an absence of a force urging a change in elevation of said litter frame relative to said base frame to thereby cause said base frame and said litter frame to become oriented closer together.

73.     The iNX Cot is an ambulance cot that includes "a base frame; a litter frame; and an elevating mechanism interconnecting said base frame and said litter frame and being configured to effect changes in elevation of said litter frame relative to said base frame." For example, the iNX Literature depicts and instructs:



(Ex. J1, iNX Sheet, at 1; *see also* Ex. J2, iNX Brochure, at 1.)

Everyday operations in EMS—like transferring patients or loading and unloading cots from an ambulance—put tremendous strain on the backs of EMS professionals.

The **iNX Integrated Patient Transport & Loading System** is the only system designed to enhance the safety of both patients and EMS professionals by effectively eliminating lifting. Now EMS professionals can lift, lower, load, and unload with the push of a button, taking the strain off of their backs.

(Ex. J1, iNX Sheet, at 1; *see also* Ex. J2, iNX Brochure, at 1.)

• Dual, powered actuators maximize tip-stability and can lift patient loads up to 700 lb

(Ex. J1, iNX Sheet, at 2; *see also* Ex. J2, iNX Brochure, at 2.)

74.     The iNX Cot includes an "elevating mechanism being configured to detect a presence and an absence of a force urging a change in elevation of said litter frame relative to said

base frame to thereby cause said base frame and said litter frame to become oriented closer together." For example, the iNX Literature depicts and instructs:

- Automatic high-speed extend & retract reduces load and unload time

(Ex. J1, iNX Sheet, at 2; *see also* Ex. J2, iNX Brochure, at 2.)

75. The elevating mechanism of the iNX Cot includes a detection device (e.g., a contact sensor) to detect a presence and an absence of a force as claimed. For example, the detection device determines whether the iNX Cot is supported by the ground such that the leg retraction speed is increased when the iNX Cot is not supported by the ground to, for example, facilitate loading into an ambulance.



76. Claim 2 of the 571 Patent recites:

2. An ambulance cot comprising:

a base frame and a litter frame;

a deployment mechanism interconnecting said base frame and said litter frame and being configured to effect changes in distance between said litter frame and said base frame, said deployment mechanism having a detection device configured to detect a presence and an absence of a force

urging a change in distance between said litter frame and said base frame to cause said base frame and said litter frame to become oriented closer together; and

a control mechanism on said ambulance cot, said control mechanism including a manually operable device for controlling said deployment mechanism, said control mechanism being configured to effect a rapid movement of said deployment mechanism in response to said detection device detecting an absence of said force and in response to an operation of said manually operable device, whereby when said ambulance cot is lifted away from a support surface, causing said detection device to detect an absence of said force, and said manually operable device, is operated, said base frame will be rapidly drawn toward said litter frame by said deployment mechanism.

77. The iNX Cot is an ambulance cot that includes "a base frame and a litter frame; [and] a deployment mechanism interconnecting said base frame and said litter frame and being configured to effect changes in distance between said litter frame and said base frame." For example, the iNX Literature depicts and instructs:



(Ex. J1, iNX Sheet, at 1; *see also* Ex. J2, iNX Brochure, at 1.)

Everyday operations in EMS—like transferring patients or loading and unloading cots from an ambulance—put tremendous strain on the backs of EMS professionals.

The **iNX Integrated Patient Transport & Loading System** is the only system designed to enhance the safety of both patients and EMS professionals by effectively eliminating lifting. Now EMS professionals can lift, lower, load, and unload with the push of a button, taking the strain off of their backs.

(Ex. J1, iNX Sheet, at 1; *see also* Ex. J2, iNX Brochure, at 1.)

- Dual, powered actuators maximize tip-stability and can lift patient loads up to 700 lb

(Ex. J1, iNX Sheet, at 2; *see also* Ex. J2, iNX Brochure, at 2.)

78.    The iNX Cot includes a "deployment mechanism having a detection device configured to detect a presence and an absence of a force urging a change in distance between said litter frame and said base frame to cause said base frame and said litter frame to become oriented closer together."

- Automatic high-speed extend & retract reduces load and unload time

(Ex. J1, iNX Sheet, at 2; *see also* Ex. J2, iNX Brochure, at 2.)

79.    The elevating mechanism of the iNX Cot includes a detection device (e.g., a contact sensor) to detect a presence and an absence of a force as claimed. For example, the detection device determines whether the iNX Cot is supported by the ground such that the leg retraction speed is increased when the iNX Cot is not supported by the ground to, for example, facilitate loading into an ambulance.



80. The iNX Cot includes a "control mechanism on said ambulance cot, said control mechanism including a manually operable device for controlling said deployment mechanism, said control mechanism being configured to effect a rapid movement of said deployment mechanism in response to said detection device detecting an absence of said force and in response to an operation of said manually operable device, whereby when said ambulance cot is lifted away from a support surface, causing said detection device to detect an absence of said force, and said manually operable device, is operated, said base frame will be rapidly drawn toward said litter frame by said deployment mechanism." For example, the iNX Literature depicts and instructs:

- Automatic high-speed extend & retract reduces load and unload time

(Ex. J1, iNX Sheet, at 2; *see also* Ex. J2, iNX Brochure, at 2.)



(Ex. J3, iNX Manual, at 33.)

81.     The speed at which the iNX Cot retracts when the litter frame is supported by an external support separate from said elevating mechanism (i.e., off the ground) is faster than the speed when the base frame is supported on the surface (e.g., the ground).

82.     Claim 5 of the 571 Patent recites:

> 5. An ambulance cot, comprising:
>
> a base frame configured for support on a surface;
>
> a litter frame configured for supporting thereon a patient;
>
> an elevating mechanism interconnecting said base frame and said litter frame and being configured to interconnect said litter frame and said base frame in order to facilitate movement of said base frame and said litter frame toward and away from each other; and
>
> a control mechanism on said cot configured to facilitate said movement of said base frame and said litter frame toward each other and at differing speeds predicated on at least one of whether said base frame is supported on said surface and said litter frame is supported by an external support separate from said elevating mechanism.

83.     The iNX Cot is an ambulance cot that includes "a base frame configured for support on a surface; a litter frame configured for supporting thereon a patient; [and] an elevating mechanism interconnecting said base frame and said litter frame and being configured to interconnect said litter frame and said base frame in order to facilitate movement of said base frame

and said litter frame toward and away from each other." For example, the iNX Literature depicts and instructs:



(Ex. J1, iNX Sheet, at 1; *see also* Ex. J2, iNX Brochure, at 1.)

> Everyday operations in EMS—like transferring patients or loading and unloading cots from an ambulance—put tremendous strain on the backs of EMS professionals.
>
> The **iNX Integrated Patient Transport & Loading System** is the only system designed to enhance the safety of both patients and EMS professionals by effectively eliminating lifting. Now EMS professionals can lift, lower, load, and unload with the push of a button, taking the strain off of their backs.

(Ex. J1, iNX Sheet, at 1; *see also* Ex. J2, iNX Brochure, at 1.)

> • Dual, powered actuators maximize tip-stability and can lift patient loads up to 700 lb

(Ex. J1, iNX Sheet, at 2; *see also* Ex. J2, iNX Brochure, at 2.)

84.　The iNX Cot includes a "control mechanism on said cot configured to facilitate said movement of said base frame and said litter frame toward each other and at differing speeds predicated on at least one of whether said base frame is supported on said surface and said litter frame is supported by an external support separate from said elevating mechanism." For example, the iNX Literature depicts and instructs:

- Automatic high-speed extend & retract reduces load and unload time

(Ex. J1, iNX Sheet, at 2; *see also* Ex. J2, iNX Brochure, at 2.)

85.    Further, the speed at which the iNX Cot retracts when the litter frame is supported by an external support separate from said elevating mechanism (i.e., off the ground) is faster than the speed when the base frame is supported on the surface (e.g., the ground).

86.    Claim 6 of the 571 Patent recites: "The ambulance cot according to claim 5, wherein said control mechanism is configured such that when said base frame is supported on said surface, said control mechanism controls said elevating mechanism to move said litter frame toward said base frame at a preselected speed."

87.    The iNX Cot includes the "ambulance cot according to claim 5" as explained above. The iNX Cot also includes or otherwise provides that "said control mechanism is configured such that when said base frame is supported on said surface, said control mechanism controls said elevating mechanism to move said litter frame toward said base frame at a preselected speed."

88.     Further, the speed at which the iNX Cot retracts when the litter frame is supported by an external support separate from said elevating mechanism (i.e., off the ground) is faster than the speed (i.e., the preselected speed) when the base frame is supported on the surface (e.g., the ground).

89.    Claim 7 of the 571 Patent recites: "The ambulance cot according to claim 5, wherein said control mechanism is configured such that when said litter frame is supported by the external support separate from said elevating mechanism, said control mechanism controls said elevating mechanism to move said base frame toward said litter frame at a pre-selected speed."

90.     The iNX Cot includes the "ambulance cot according to claim 5" as explained above. The iNX Cot also includes or otherwise provides that "said control mechanism is configured such that when said litter frame is supported by the external support separate from said elevating mechanism, said control mechanism controls said elevating mechanism to move said base frame toward said litter frame at a pre-selected speed."

91.     Further, the speed (i.e., the preselected speed) at which the iNX Cot retracts when the litter frame is supported by an external support separate from said elevating mechanism (i.e., off the ground) is faster than the speed when the base frame is supported on the surface (e.g., the ground).

92.     Claim 8 of the 571 Patent recites:

> 8. The ambulance cot according to claim 5, wherein said control mechanism is configured such that when said base frame is supported on said surface, said control mechanism controls said elevating mechanism to move said litter frame toward said base frame at a first speed; and
>
> wherein said control mechanism is additionally configured such that when said litter frame is supported by the external support separate from said elevating mechanism, said control mechanism controls said elevating mechanism to move said base frame toward said litter frame at a second speed.

93.     The iNX Cot includes the "ambulance cot according to claim 5" as explained above. The iNX Cot also includes or otherwise provides that "wherein said control mechanism is configured such that when said base frame is supported on said surface, said control mechanism controls said elevating mechanism to move said litter frame toward said base frame at a first speed [and] wherein said control mechanism is additionally configured such that when said litter frame is supported by the external support separate from said elevating mechanism, said control mechanism controls said elevating mechanism to move said base frame toward said litter frame at a second speed."

94.     Further, the speed (i.e., second speed) at which the iNX Cot retracts when the litter frame is supported by an external support separate from said elevating mechanism (i.e., off the ground) is faster than the speed (i.e., first speed) when the base frame is supported on the surface (e.g., the ground).

95.     Claim 9 of the 571 Patent recites: "The ambulance cot according to claim 8, wherein said first and second speeds are each pre-selected and said second preselected speed is significantly different than said first pre-selected speed."

96.     The iNX Cot includes the "ambulance cot according to claim 8" as explained above. The iNX Cot also includes or otherwise provides that "said first and second speeds are each pre-selected and said second preselected speed is significantly different than said first pre-selected speed."

97.     Further, the speed (i.e., second speed) at which the iNX Cot retracts when the litter frame is supported by an external support separate from said elevating mechanism (i.e., off the ground) is faster than the speed (i.e., first speed) while supported by the base frame (e.g., the ground).

98.     Claim 10 of the 571 Patent recites: "The ambulance cot according to claim 8, wherein said second speed is greater than said first speed."

99.     The iNX Cot includes the "ambulance cot according to claim 8" as explained above. The iNX Cot also includes or otherwise provides that "said second speed is greater than said first speed."

100.     Further, the speed (i.e., second speed) at which the iNX Cot retracts when the litter frame is supported by an external support separate from said elevating mechanism (i.e., off the

ground) is faster than the speed (i.e., first speed) while supported by the base frame (e.g., the ground).

101.    Claim 14 of the 571 Patent recites: "The ambulance cot according to claim 5, wherein the external support is provided by an attendant lifting up on said litter frame."

102.    The iNX Cot includes the "ambulance cot according to claim 5" as explained above. The iNX Cot also includes or otherwise provides that "the external support is provided by an attendant lifting up on said litter frame." For example, as can be seen from the iNX Literature:



(Ex. J1, iNX Sheet, at 1; *see also* Ex. J2, iNX Brochure, at 1.)

103.    Defendants have also indirectly infringed and continue to indirectly infringe at least claims 1-2, 5-10, and 14 of the 571 Patent by inducing infringement pursuant to 35 U.S.C. § 271(b) and/or contributing to infringement pursuant to 35 U.S.C. § 271(c).

104.    On information and belief, Defendants' customers directly infringe the 571 Patent. For example, when the X1 Cot and the iNX Cot are sold to Defendants' customers, such as hospitals, EMS providers, and EMS personnel, those customers infringe at least claims 1-2, 5-10, and 14 of the 571 Patent through the use of the X1 Cot and the iNX Cot.

105. On information and belief, Defendants have directed and direct third parties, including customers and other users, in the United States, to use the X1 Cot and the iNX Cot, which directly infringe the 571 Patent and which Defendants know infringe the 571 Patent. Defendants provide instructions to third parties including customers, such as hospitals, EMS providers, and EMS personnel, on how to use the Accused Products in a manner that Defendants know practices the claimed inventions. For example, as described above, Defendants' promotional materials and guides describe how to use the X1 Cot and the iNX Cot. The promotional materials and guides highlight the infringing features to customers, such as hospitals, EMS providers, and EMS personnel. Example promotional materials and guides are attached to this Complaint as Exhibits I through L.

106. On information and belief, in violation of 35 U.S.C. § 271(b), Defendants specifically intend to induce infringement of the 571 Patent by their customers and users of the X1 Cot and the iNX Cot and have knowledge that the inducing acts would cause infringement or were willfully blind to the possibility that their inducing acts would cause infringement. As discussed earlier in this Complaint, Defendants have cited at least the 571 Patent, and various other Stryker patents related to the Asserted Patents during prosecution of Defendants' own patent applications.

107. On information and belief, at all relevant times, Defendants knew or were willfully blind to how the X1 Cot and the iNX Cot infringe the 571 Patent. Defendants have been and are actively inducing infringement of the 571 Patent by actively and knowingly inducing third parties such as customers (e.g., hospitals, EMS providers, and EMS personnel) to commit acts that Defendants know constitute infringement of the 571 Patent.

108. On information and belief, Defendants actively and knowingly intended to aid, abet, direct, encourage, or otherwise instruct such third parties by Defendants' offer for sale and

36

sale of the X1 Cot and the iNX Cot and instructions to infringe the 571 Patent. Defendants encourage infringement by customers at least by providing product promotional materials and guides, as discussed above, that instruct users on how to use the X1 Cot and the iNX Cot in an infringing manner. Defendants have and continue to specifically intend to induce infringement of the 571 Patent.

109.    On information and belief, despite Defendants' knowledge of the 571 Patent and knowledge that customers will necessarily infringe the 571 Patent when the X1 Cot and the iNX Cot are used as instructed, Defendants have encouraged, and continue to encourage, infringement.

110.    Defendants also contribute to infringement of the 571 Patent by Defendants' customers in violation of 35 U.S.C. §271(c). On information and belief, Defendants were aware of the 571 Patent at all relevant times, as discussed above. Defendants sell and offer for sale within the United States the X1 Cot and the iNX Cot knowing that they constitute a material part of the claimed inventions of the 571 Patent, knowing that the X1 Cot and the iNX Cot are especially made or especially adapted for use in infringing the 571 Patent, and knowing that the X1 Cot and the iNX Cot are not a staple article or commodity of commerce suitable for substantial non-infringing use.

111.    Unless enjoined by this Court, Defendants will continue to infringe the 571 Patent and as a direct result the Stryker Plaintiffs will continue to suffer harm, including irreparable harm for which there is no adequate remedy at law. Accordingly, the Stryker Plaintiffs are entitled to injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

112.    The Stryker Plaintiffs have suffered and will continue to suffer damage as a direct and proximate result of Defendants' infringement of the 571 Patent. Thus, in addition to injunctive

relief, the Stryker Plaintiffs are entitled to recover damages for such infringement pursuant to 35 U.S.C. § 284 in an amount to be proven at trial.

113.    On information and belief, the infringement of the 571 Patent by Defendants has been and continues to be willful and deliberate.

114.    Defendants have committed and continue to commit all of the above acts of infringement without license or authorization from either of the Stryker Plaintiffs.

115.    On information and belief, Defendants have had knowledge of the 571 Patent and knowledge that the X1 Cot and the iNX Cot are covered by the 571 Patent. As discussed earlier in this Complaint, Defendants have cited at least the 571 Patent, and various other Stryker patents related to the Asserted Patents during prosecution of Defendants' own patent applications. Defendants have copied and made, offered for sale and sold the X1 Cot and the iNX Cot knowing of the risk of infringement and/or in view of a risk of infringement that was sufficiently obvious that it should have been known to Defendants. Defendants' infringing actions have been and continue to be willful, entitling the Stryker Plaintiffs to increased damages pursuant to 35 U.S.C. § 284.

116.    Defendants' egregious conduct justifies an increase of three times the damages to be assessed pursuant to 35 U.S.C. § 284, and further qualifies this action as an exceptional case supporting an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

**SECOND CAUSE OF ACTION**
**(Infringement of U.S. RE44,884)**

117.    The Stryker Plaintiffs incorporate the foregoing paragraphs by reference as though set forth fully herein.

118.    Defendants have directly infringed, and continue to directly infringe, literally or under the doctrine of equivalents, at least Claims 3 and 4 of the 884 Reissue Patent by making,

using, offering to sell, and/or selling within the United States, and/or by importing into the United States, certain products, including but not limited to the X1 Cot, and induced infringement, pursuant to 35 U.S.C. § 271(b), and/or contributed to infringement, pursuant to 35 U.S.C. § 271(c), of the 884 Reissue Patent by others, including customers, such as hospitals, EMS providers, and EMS personnel.

119.    On information and belief, the X1 Cot meets every limitation, literally or under the doctrine of equivalents, of at least Claims 3 and 4 of the 884 Reissue Patent, and Defendants' making, using, offering for sale, selling and/or importing into the United States the X1 Cot directly infringes at least Claims 3 and 4 of the 884 Reissue Patent pursuant to 35 U.S.C. § 271(a).

120.    The Stryker Plaintiffs provide the following examples to show that Defendants' iNX Cot infringes Claims 3 and 4 of the 884 Reissue Patent.

121.    Claim 3 of the 884 Reissue Patent recites:

3. An ambulance cot, comprising:

a base frame;

a litter frame; and

an X-frame support mechanism interconnecting said base frame and said litter frame and being configured to support said litter frame in one of a plurality of positions relative to said base frame,

said support mechanism including at least one pair of frame members pivotally secured to each other proximate the mid-length thereof, said at least one pair of frame members each having opposite ends respectively secured to one of said base frame and said litter frame, at least one of said pair of frame members having a first mount oriented between said mid-length thereof and said litter frame, said first mount being configured to engage said base frame in response to said litter frame becoming proximate said base frame; and

wherein said base frame has longitudinally extending side rails and at least one crosswise member interconnecting said side rails and being oriented in a path of movement of said first mount as said litter frame

becomes proximate said base frame so that said first mount engages and rests upon said at least one crosswise member.

122. The X1 Cot is an ambulance cot that includes "a base frame; a litter frame; and an X-frame support mechanism interconnecting said base frame and said litter frame and being configured to support said litter frame in one of a plurality of positions relative to said base frame." For example, the X1 Literature depicts and instructs:



(Ex. I1, X1 Sheet, at 1; *see also* Ex. I2, X1 Brochure, at 1.)

The **POWER X1 Ambulance Cot** offers more power, stability, maneuverability, and speed than the leading competitive powered cot.

With an unassisted lift capacity of 700 lb, the POWER X1 is the ultimate solution for both everyday and bariatric transport. Its industry-leading battery technology provides high-powered, reliable performance on every call. The POWER X1 is cross-compatible, as it can be used with a range of fastener systems.

(Ex. I1, X1 Sheet, at 1; *see also* Ex. I2, X1 Brochure, at 1.)

- **700 lb unassisted lift capacity** reduces the strain of everyday and bariatric transport

(Ex. I1, X1 Sheet, at 2; *see also* Ex. I2, X1 Brochure, at 2.)

- **Programmable load height** adjusts to match the height of your ambulance floor

(Ex. I1, X1 Sheet, at 2; *see also* Ex. I2, X1 Brochure, at 2.)

123. The X1 Cot also includes or otherwise provides a "support mechanism including at least one pair of frame members pivotally secured to each other proximate the mid-length thereof, said … frame members each having opposite ends respectively secured to one of said base frame and said litter frame." For example, the iNX Literature depicts and instructs:



(Ex. I1, X1 Sheet, at 1; *see also* Ex. I2, X1 Brochure, at 1.)

124. The X1 Cot also includes or otherwise provides that "at least one of said pair of frame members having a first mount oriented between said mid-length thereof and said litter frame, said first mount being configured to engage said base frame in response to said litter frame becoming proximate said base frame." For example, the iNX Literature depicts and instructs:



125.    The X1 Cot includes a "base frame [that] has longitudinally extending side rails and at least one crosswise member interconnecting said side rails and being oriented in a path of movement of said first mount as said litter frame becomes proximate said base frame so that said first mount engages and rests upon said at least one crosswise member." For example, the iNX Literature depicts and instructs:



126.    Claim 4 of the 884 Reissue Patent recites: "The ambulance cot according to claim 3, wherein said first mount engages and rests upon said at least one crosswise member between the respective said side rails of said base frame."

127. The X1 Cot includes the "ambulance cot according to claim 3" as explained above. The X1 Cot also includes or otherwise provides that "said first mount engages and rests upon said at least one crosswise member between the respective said side rails of said base frame." For example, as can be seen from the iNX Literature:



128. Defendants have also indirectly infringed and continue to indirectly infringe at least claims 3 and 4 of the 884 Reissue Patent by inducing infringement pursuant to 35 U.S.C. § 271(b) and/or contributing to infringement pursuant to 35 U.S.C. § 271(c).

129. On information and belief, Defendants' customers directly infringe the 884 Reissue Patent. For example, when the X1 Cot is sold to Defendants' customers, such as hospitals, EMS providers, and EMS personnel, those customers infringe at least claims 3 and 4 of the 884 Reissue Patent through the use of the X1 Cot.

130. On information and belief, Defendants have directed and direct third parties, including customers and other users, in the United States, to use the X1 Cot, which directly infringe the 884 Reissue Patent and which Defendants know infringes the 884 Reissue Patent. Defendants

provide instructions to third parties including customers, such as hospitals, EMS providers, and EMS personnel, on how to use the Accused Products in a manner that Defendants know practices the claimed inventions. For example, as described above, Defendants' promotional materials and guides describe how to use the X1 Cot. The promotional materials and guides highlight the infringing features to customers, such as hospitals, EMS providers, and EMS personnel. Example promotional materials and guides are attached to this Complaint as Exhibits I through L.

131.    On information and belief, in violation of 35 U.S.C. § 271(b), Defendants specifically intend to induce infringement of the 884 Reissue Patent by their customers and users of the X1 Cot and have knowledge that the inducing acts would cause infringement or were willfully blind to the possibility that their inducing acts would cause infringement. As discussed earlier in this Complaint, Defendants have cited at least the 884 Reissue Patent, and various other Stryker patents related to the Asserted Patents during prosecution of Defendants' own patent applications.

132.    On information and belief, at all relevant times, Defendants knew or were willfully blind to how the X1 Cot infringes the 884 Reissue Patent. Defendants have been and are actively inducing infringement of the 884 Reissue Patent by actively and knowingly inducing third parties such as customers (e.g., hospitals, EMS providers, and EMS personnel) to commit acts that Defendants know constitute infringement of the 884 Reissue Patent.

133.    On information and belief, Defendants actively and knowingly intended to aid, abet, direct, encourage, or otherwise instruct such third parties by Defendants' offer for sale and sale of the X1 Cot and instructions to infringe the 884 Reissue Patent. Defendants encourage infringement by customers at least by providing product promotional materials and guides, as

discussed above, that instruct users on how to use the X1 Cot in an infringing manner. Defendants have and continue to specifically intend to induce infringement of the 884 Reissue Patent.

134.    On information and belief, despite Defendants' knowledge of the 884 Reissue Patent and knowledge that customers will necessarily infringe the 884 Reissue Patent when the X1 Cot is used as instructed, Defendants have encourage, and continue to encourage, infringement.

135.    Defendants also contribute to infringement of the 884 Reissue Patent by Defendants' customers in violation of 35 U.S.C. §271(c). On information and belief, Defendants were aware of the 884 Reissue Patent at all relevant times, as discussed above. Defendants sell and offer for sale within the United States the X1 Cot knowing that they constitute a material part of the claimed inventions of the 884 Reissue Patent, knowing that the X1 Cot is especially made or especially adapted for use in infringing the 884 Reissue Patent, and knowing that the X1 Cot is not a staple article or commodity of commerce suitable for substantial non-infringing use.

136.    Unless enjoined by this Court, Defendants will continue to infringe the 884 Reissue Patent and as a direct result the Stryker Plaintiffs will continue to suffer harm, including irreparable harm for which there is no adequate remedy at law. Accordingly, the Stryker Plaintiffs are entitled to injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

137.    The Stryker Plaintiffs have suffered and will continue to suffer damage as a direct and proximate result of Defendants' infringement of the 884 Reissue Patent. Thus, in addition to injunctive relief, the Stryker Plaintiffs are entitled to recover damages for such infringement pursuant to 35 U.S.C. § 284 in an amount to be proven at trial.

138.    On information and belief, the infringement of the 884 Reissue Patent by Defendants has been and continues to be willful and deliberate.

139.     Defendants have committed and continue to commit all of the above acts of infringement without license or authorization from either of the Stryker Plaintiffs.

140.     On information and belief, Defendants have had knowledge of the 884 Reissue Patent and knowledge that the X1 Cot is covered by the 884 Reissue Patent. As discussed earlier in this Complaint, Defendants have cited at least the 884 Reissue Patent, and various other Stryker patents related to the Asserted Patents during prosecution of Defendants' own patent applications. Defendants have copied and made, offered for sale and sold the X1 Cot knowing of the risk of infringement and/or in view of a risk of infringement that was sufficiently obvious that it should have been known to Defendants. Defendants' infringing actions have been and continue to be willful, entitling the Stryker Plaintiffs to increased damages pursuant to 35 U.S.C. § 284.

141.     Defendants' egregious conduct justifies an increase of three times the damages to be assessed pursuant to 35 U.S.C. § 284, and further qualifies this action as an exceptional case supporting an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

### THIRD CAUSE OF ACTION
### (Infringement of U.S. 7,725,968)

142.     The Stryker Plaintiffs incorporate the foregoing paragraphs by reference as though set forth fully herein.

143.     Defendants have directly infringed, and continue to directly infringe, literally or under the doctrine of equivalents, at least claims 1-10, 12-13, and 15-22 of the 968 Patent by making, using, offering to sell, and/or selling within the United States, and/or by importing into the United States, certain products, including but not limited to the iNX Cot, and induced infringement, pursuant to 35 U.S.C. § 271(b), and/or contributed to infringement, pursuant to 35 U.S.C. § 271(c), of the 968 Patent by others, including customers, such as hospitals, EMS providers, and EMS personnel.

144.    On information and belief, the iNX Cot meets every limitation, literally or under the doctrine of equivalents, of at least claims 1-10, 12-13, and 15-22 of the 968 Patent, and Defendants' making, using, offering for sale, selling and/or importing into the United States the iNX Cot directly infringes at least claims 1-10, 12-13, and 15-22 of the 968 Patent pursuant to 35 U.S.C. § 271(a).

145.    The Stryker Plaintiffs provide the following examples to show that Defendants' iNX Cot infringes claims 1-10, 12-13, and 15-22 of the 968 Patent.

146.    Claim 1 of the 968 Patent recites:

1. An ambulance cot comprising:

a wheeled base; and

a patient litter disposed above and supported for adjustable vertical movement on said base by a support mechanism, the patient litter comprising:

a pair of longitudinally extending side rails, the side rails configured to extend from a head end to a foot end of the patient litter;

a retractable, generally U-shaped head section, the head section having a pair of parallel legs connected by a cross rail, the legs being configured to be slidably received into the interior of the respective longitudinally extending side rails, a pair of brackets connecting the legs to a head rail, a cross rail pivotally received by the brackets, at least one handle pivotally mounted for movement about an axis corresponding to or parallel to the axis of the cross rail, the handle being connected to a pin configured for rotation about the axis of rotation defined by or parallel to the axis of the cross rail.

147.    The iNX Cot is an ambulance cot that includes "a wheeled base; and a patient litter disposed above and supported for adjustable vertical movement on said base by a support mechanism." For example, the iNX Literature depicts and instructs:

48



(Ex. J1, iNX Sheet, at 1; *see also* Ex. J2, iNX Brochure, at 1.)

Everyday operations in EMS—like transferring patients or loading and unloading cots from an ambulance—put tremendous strain on the backs of EMS professionals.

The **iNX Integrated Patient Transport & Loading System** is the only system designed to enhance the safety of both patients and EMS professionals by effectively eliminating lifting. Now EMS professionals can lift, lower, load, and unload with the push of a button, taking the strain off of their backs.

(Ex. J1, iNX Sheet, at 1; *see also* Ex. J2, iNX Brochure, at 1.)

• Dual, powered actuators maximize tip-stability and can lift patient loads up to 700 lb

(Ex. J1, iNX Sheet, at 2; *see also* Ex. J2, iNX Brochure, at 2.)



(Ex. J3, iNX Manual, at 33.)

148. The iNX Cot also includes or otherwise provides that "the patient litter [comprises] a pair of longitudinally extending side rails, the side rails configured to extend from a head end to a foot end of the patient litter [and] a retractable, generally U-shaped head section." For example, the iNX Literature depicts and instructs:



(Ex. J3, iNX Manual, at 15.)

149. The iNX Cot also includes or otherwise provides that "the head section having a pair of parallel legs connected by a cross rail, the legs being configured to be slidably received into the interior of the respective longitudinally extending side rails." For example, the iNX Literature depicts and instructs:



(Ex. J3, iNX Manual, at 26.)



(Ex. J3, iNX Manual, at 26.)

150. The iNX Cot also includes or otherwise provides "a pair of brackets connecting the legs to a head rail, a cross rail pivotally received by the brackets." For example, the iNX Literature depicts and instructs:



(Ex. J3, iNX Manual, at 26.)

151.    The iNX Cot also includes or otherwise provides "at least one handle pivotally mounted for movement about an axis corresponding to or parallel to the axis of the cross rail." For example, the iNX Literature depicts and instructs:





(Ex. J3, iNX Manual, at 3.)

152. The iNX Cot also includes or otherwise provides that "the handle [is] connected to a pin configured for rotation about the axis of rotation defined by or parallel to the axis of the cross rail." For example, the iNX Literature depicts and instructs:



153. Claim 2 of the 968 Patent recites: "The ambulance cot according to claim 1, wherein the at least one handle comprises first and second handles, the first and second handles being affixed to the cross rail such that actuation of either of the first and second handles effects a rotation of the cross rail and actuation of the other handle."

154. The iNX Cot includes the "ambulance cot according to claim 1" as explained above. The iNX Cot also includes or otherwise provides that "the at least one handle comprises first and second handles, the first and second handles being affixed to the cross rail such that actuation of either of the first and second handles effects a rotation of the cross rail and actuation of the other handle." For example, as can be seen from the iNX Literature:



(Ex. J3, iNX Manual, at 3.)

155. Claim 3 of the 968 Patent recites: "The ambulance cot according to claim 2, further comprising a locking mechanism for selectively fixing the position of the head section in one of

an extended and a retracted position, the locking mechanism configured for actuation by the first and second handles."

156. The iNX Cot includes the "ambulance cot according to claim 2" as explained above. The iNX Cot also includes or otherwise provides "a locking mechanism for selectively fixing the position of the head section in one of an extended and a retracted position, the locking mechanism configured for actuation by the first and second handles." For example, as can be seen from the iNX Literature:



(Ex. J3, iNX Manual, at 26.)



(Ex. J3, iNX Manual, at 26.)

157.    Claim 4 of the 968 Patent recites: "The ambulance cot according to claim 3, further comprising a locking mechanism deactivation mechanism for preventing the locking mechanism from becoming disengaged by the actuation of the first or second handle."

158.    The iNX Cot includes the "ambulance cot according to claim 3" as explained above. The iNX Cot also includes or otherwise provides "a locking mechanism deactivation mechanism for preventing the locking mechanism from becoming disengaged by the actuation of the first or second handle." For example, the INX Cot includes a "locking mechanism deactivation mechanism" that, when loaded into the ambulance, pivots and prevents the locking mechanism from becoming disengaged.



(Ex. J3, iNX Manual, at 3.)





159.    Claim 5 of the 968 Patent recites: "The ambulance cot according to claim 4, further comprising a safety bar being configured to engage the locking mechanism deactivation mechanism."

160.    The iNX Cot includes the "ambulance cot according to claim 4" as explained above. The iNX Cot also includes or otherwise provides "a safety bar being configured to engage the locking mechanism deactivation mechanism." For example, as can be seen from the iNX Literature:

161.    The INX Cot includes a safety bar configured to engage a "locking mechanism deactivation mechanism" that, when loaded into the ambulance, pivots and prevents the locking mechanism from becoming disengaged.



(Ex. J3, iNX Manual, at 3.)



(Ex. J3, iNX Manual, at 38.)







162. Claim 6 of the 968 Patent recites: "The ambulance cot according to claim 3, further comprising a pin extending from each handle into the interior of a respective bracket for engaging a first end of a locking mechanism linkage, the linkage having a second end for engaging the locking mechanism, the locking mechanism comprising a retractable pin configured to engage one of a plurality of receivers within the side rail for fixing the position of the head section relative to the side rail."

163. The iNX Cot includes the "ambulance cot according to claim 3" as explained above. The iNX Cot also includes or otherwise provides "a pin extending from each handle into the interior of a respective bracket for engaging a first end of a locking mechanism linkage, the linkage having a second end for engaging the locking mechanism, the locking mechanism comprising a retractable pin configured to engage one of a plurality of receivers within the side rail for fixing the position of the head section relative to the side rail." For example, as can be seen from the iNX Literature:











164.    Claim 7 of the 968 Patent recites: "The ambulance cot according to claim 6, wherein the plurality of receivers within the side rail are covered so as to be inaccessible from outside the side rail."

165.    The iNX Cot includes the "ambulance cot according to claim 6" as explained above. The iNX Cot also includes or otherwise provides that "the plurality of receivers within the side rail are covered so as to be inaccessible from outside the side rail" For example, as can be seen from the iNX Literature:



166. Claim 8 of the 968 Patent recites: "The ambulance cot according to claim 6, wherein the locking mechanism deactivation mechanism operates by preventing movement of the pin extending from each handle into the respective bracket."

167. The iNX Cot includes the "ambulance cot according to claim 6" as explained above. The iNX Cot also includes or otherwise provides that "the locking mechanism deactivation mechanism operates by preventing movement of the pin extending from each handle into the respective bracket." For example, as can be seen from the iNX Literature:



(Ex. J3, iNX Manual, at 3.)





168.   Claim 9 of the 968 Patent recites: "The ambulance cot according to claim 1, further comprising the head section including a pair of steering wheels."

169.   The iNX Cot includes the "ambulance cot according to claim 1" as explained above. The iNX Cot also includes or otherwise provides that "the head section [includes] a pair of steering wheels." For example, as can be seen from the iNX Literature:



(Ex. J3, iNX Manual, at 15.)

170.    Claim 10 of the 968 Patent recites: "The ambulance cot according to claim 9, further comprising the steering wheels being mounted for rotation about a fixed axis (i.e. non-castered)."

171.    The iNX Cot includes the "ambulance cot according to claim 9" as explained above. The iNX Cot also includes or otherwise provides that "the steering wheels being mounted for rotation about a fixed axis (i.e. non-castered)." For example, as can be seen from the iNX Literature:



(Ex. J3, iNX Manual, at 26.)

172.    Claim 12 of the 968 Patent recites: "The ambulance cot according to claim 1, further comprising the patient litter being supported by the support mechanism at an angle α relative to a support surface, the angle α being between 1°-10°."

173.    The iNX Cot includes the "ambulance cot according to claim 1" as explained above. On information and belief, the iNX Cot also includes or otherwise provides that "the patient litter being supported by the support mechanism at an angle α relative to a support surface, the angle α being between 1°-10°." For example, as can be seen from the iNX Literature, the patient litter appears to be non-parallel to the ground by an angle that is between 1° and 10°:



(Ex. J1, iNX Sheet, at 1; *see also* Ex. J2, iNX Brochure, at 1.)

174. Claim 13 of the 968 Patent recites: "The ambulance cot according to claim 12, further comprising the angle α being between 2°-3°."

175. The iNX Cot includes the "ambulance cot according to claim 12" as explained above. On information and belief, the iNX Cot also includes or otherwise provides that "the angle α [is] between 2°-3°." For example, as can be seen from the iNX Literature, the patient litter appears to be non-parallel to the ground by an angle between 2° and 3°:



(Ex. J1, iNX Sheet, at 1; *see also* Ex. J2, iNX Brochure, at 1.)

176. Claim 15 of the 968 Patent recites:

15. An ambulance cot comprising:

a wheeled base; and

a patient litter disposed above and supported for adjustable vertical movement on said base by a support mechanism, the patient litter comprising:

a pair of longitudinally extending side rails, the side rails configured to extend from a head end to a foot end of the patient litter;

a retractable, generally U-shaped head section, the head section having a pair of parallel legs connected by a cross rail, the legs being configured to be slidably received by the respective longitudinally extending side rails, and

at least one handle pivotally mounted for movement about an axis of the cross rail, a latch mechanism for selectively fixing the position of the head section in at least one of an extended and a retracted position, the latch mechanism configured for operation by the at least one handle, and

a latch disabler configured to prevent the operation of the latch mechanism by the at least one handle.

177. The iNX Cot is an ambulance cot that includes "a wheeled base; and a patient litter disposed above and supported for adjustable vertical movement on said base by a support mechanism." For example, as can be seen from the iNX Literature:



(Ex. J1, iNX Sheet, at 1; *see also* Ex. J2, iNX Brochure, at 1.)

69

> Everyday operations in EMS—like transferring patients or loading and unloading cots from an ambulance—put tremendous strain on the backs of EMS professionals.
>
> The **iNX Integrated Patient Transport & Loading System** is the only system designed to enhance the safety of both patients and EMS professionals by effectively eliminating lifting. Now EMS professionals can lift, lower, load, and unload with the push of a button, taking the strain off of their backs.

(Ex. J1, iNX Sheet, at 1; *see also* Ex. J2, iNX Brochure, at 1.)

> • Dual, powered actuators maximize tip-stability and can lift patient loads up to 700 lb

(Ex. J1, iNX Sheet, at 2; *see also* Ex. J2, iNX Brochure, at 2.)



(Ex. J3, iNX Manual, at 33.)

178.     The iNX Cot also includes or otherwise provides "a pair of longitudinally extending side rails, the side rails configured to extend from a head end to a foot end of the patient litter." For example, as can be seen from the iNX Literature:



(Ex. J3, iNX Manual, at 15.)

179.   The iNX Cot also includes or otherwise provides "a retractable, generally U-shaped head section, the head section having a pair of parallel legs connected by a cross rail, the legs being configured to be slidably received by the respective longitudinally extending side rails." For example, as can be seen from the iNX Literature:



(Ex. J3, iNX Manual, at 26.)



(Ex. J3, iNX Manual, at 26.)

180.     The iNX Cot also includes or otherwise provides "at least one handle pivotally mounted for movement about an axis of the cross rail." For example, as can be seen from the iNX Literature:



181.     The iNX Cot also includes or otherwise provides "a latch mechanism for selectively

fixing the position of the head section in at least one of an extended and a retracted position, the

latch mechanism configured for operation by the at least one handle." For example, as can be seen

from the iNX Literature:



(Ex. J3, iNX Manual, at 26.)



(Ex. J3, iNX Manual, at 26.)

182. The iNX Cot also includes or otherwise provides "a latch disabler configured to prevent the operation of the latch mechanism by the at least one handle." For example, the INX Cot includes a safety bar coupled to a "latch disabler" that, when loaded into the ambulance, pivots and prevents the locking mechanism from becoming disengaged.



(Ex. J3, iNX Manual, at 3.)





183.    Claim 16 of the 968 Patent recites: "The ambulance cot according to claim 15, the head section further comprising a safety bar connected by a mounting bracket for pivotal movement about the axis of the cross rail, the mounting bracket including a head portion eccentrically disposed about the axis of the cross rail."

184.    The iNX Cot includes the "ambulance cot according to claim 15" as explained above. The iNX Cot also includes or otherwise provides that "the head section further comprising a safety bar connected by a mounting bracket for pivotal movement about the axis of the cross rail, the mounting bracket including a head portion eccentrically disposed about the axis of the cross rail." For example, as can be seen from the iNX Literature:



(Ex. J3, iNX Manual, at 3.)





(Ex. J3, iNX Manual, at 38.)

185.    Claim 17 of the 968 Patent recites: "The ambulance cot according to claim 16, the head portion further comprising a ramp portion configured for displacing a blocking pin within one of the parallel legs to block the link pin."

186.    The iNX Cot includes the "ambulance cot according to claim 16" as explained above. On information and belief, the iNX Cot also includes or otherwise provides that "the head portion further [comprises] a ramp portion configured for displacing a blocking pin within one of the parallel legs to block the link pin."







187.    Claim 18 of the 968 Patent recites: "The ambulance cot according to claim 17, the at least one handle further comprising a first handle and a second handle, each associated with a respective parallel leg and corresponding latch mechanism within the respective parallel leg."

188.    The iNX Cot includes the "ambulance cot according to claim 17" as explained above. The iNX Cot also includes or otherwise provides that "the at least one handle further comprising a first handle and a second handle, each associated with a respective parallel leg and corresponding latch mechanism within the respective parallel leg." For example, as can be seen from the iNX Literature:



(Ex. J3, iNX Manual, at 3.)





189. Claim 19 of the 968 Patent recites: "The ambulance cot according to claim 18, further comprising a pair of latch disablers, each associated with a respective parallel leg, handle and latch mechanism."

190. The iNX Cot includes the "ambulance cot according to claim 18" as explained above. The iNX Cot also includes or otherwise provides "a pair of latch disablers, each associated with a respective parallel leg, handle and latch mechanism." For example, as can be seen from the iNX Literature:



(Ex. J3, iNX Manual, at 3.)



191.    Claim 20 of the 968 Patent recites: "The ambulance cot according to claim 18, the first and second handles being affixed to the cross rail such that actuation of either of the first and second handles effects a rotation and actuation of the other handle."

192.    The iNX Cot includes the "ambulance cot according to claim 18" as explained above. The iNX Cot also includes or otherwise provides that "the first and second handles being affixed to the cross rail such that actuation of either of the first and second handles effects a rotation and actuation of the other handle." For example, as can be seen from the iNX Literature:



(Ex. J3, iNX Manual, at 3.)

193.    Claim 21 of the 968 Patent recites: "The ambulance cot according to claim 15, further comprising the handle including a link pin extending into the interior of a respective leg for engaging a first end of a latch mechanism linkage, the linkage having a second end for engaging the latch mechanism, and the latch mechanism comprising a retractable latch pin configured to engage one of a plurality of receivers within the side rail for fixing the position of the head section relative to the side rail."

194.    The iNX Cot includes the "ambulance cot according to claim 15" as explained above. The iNX Cot also includes or otherwise provides that "the handle [includes] a link pin

extending into the interior of a respective leg for engaging a first end of a latch mechanism linkage, the linkage having a second end for engaging the latch mechanism, and the latch mechanism comprising a retractable latch pin configured to engage one of a plurality of receivers within the side rail for fixing the position of the head section relative to the side rail." For example, as can be seen from the iNX Literature:











195.     Claim 22 of the 968 Patent recites: "The ambulance cot according to claim 21, further comprising the latch disabler preventing the movement of the handle about the axis of the cross rail by blocking the link pin."

196.     The iNX Cot includes the "ambulance cot according to claim 21" as explained above. The iNX Cot also includes or otherwise provides that "the latch disabler [prevents] the movement of the handle about the axis of the cross rail by blocking the link pin." For example, as can be seen from the iNX Literature:



Latch Disabler

197.    Defendants have also indirectly infringed and continue to indirectly infringe at least claims 1-10, 12-13, and 15-22 of the 968 Patent by inducing infringement pursuant to 35 U.S.C. § 271(b) and/or contributing to infringement pursuant to 35 U.S.C. § 271(c).

198.    On information and belief, Defendants' customers directly infringe the 968 Patent. For example, when the iNX Cot is sold to Defendants' customers, such as hospitals, EMS providers, and EMS personnel, those customers infringe at least claims 1-10, 12-13, and 15-22 of the 968 Patent through the use of the iNX Cot.

199.    On information and belief, Defendants have directed and direct third parties, including customers and other users, in the United States, to use the iNX Cot, which directly infringes the 968 Patent and which Defendants know infringes the 968 Patent. Defendants provide instructions to third parties including customers, such as hospitals, EMS providers, and EMS personnel, on how to use the Accused Products in a manner that Defendants know practices the claimed inventions. For example, as described above, Defendants' promotional materials and guides describe how to use the iNX Cot. The promotional materials and guides highlight the

infringing features to customers, such as hospitals, EMS providers, and EMS personnel. Example promotional materials and guides are attached to this Complaint as Exhibits I through L.

200.   On information and belief, in violation of 35 U.S.C. § 271(b), Defendants specifically intend to induce infringement of the 968 Patent by their customers and users of the iNX Cot and have knowledge that the inducing acts would cause infringement or were willfully blind to the possibility that their inducing acts would cause infringement. As discussed earlier in this Complaint, Defendants have cited at least the 968 Patent, and various other Stryker patents related to the Asserted Patents during prosecution of Defendants' own patent applications.

201.   On information and belief, at all relevant times, Defendants knew or were willfully blind to how the iNX Cot infringes the 968 Patent. Defendants have been and are actively inducing infringement of the 968 Patent by actively and knowingly inducing third parties such as customers (e.g., hospitals, EMS providers, and EMS personnel) to commit acts that Defendants know constitute infringement of the 968 Patent.

202.   On information and belief, Defendants actively and knowingly intended to aid, abet, direct, encourage, or otherwise instruct such third parties by Defendants' offer for sale and sale of the iNX Cot and instructions to infringe the 968 Patent. Defendants encourage infringement by customers at least by providing product promotional materials and guides, as discussed above, that instruct users on how to use the iNX Cot in an infringing manner. Defendants have and continue to specifically intend to induce infringement of the 968 Patent.

203.   On information and belief, despite Defendants' knowledge of the 968 Patent and knowledge that customers will necessarily infringe the 968 Patent when the iNX Cot is used as instructed, Defendants have encouraged, and continue to encourage, infringement.

204. Defendants also contribute to infringement of the 968 Patent by Defendants' customers in violation of 35 U.S.C. §271(c). On information and belief, Defendants were aware of the 968 Patent at all relevant times, as discussed above. Defendants sell and offer for sale within the United States the iNX Cot knowing that they constitute a material part of the claimed inventions of the 968 Patent, knowing that the iNX Cot is especially made or especially adapted for use in infringing the 968 Patent, and knowing that the iNX Cot is not a staple article or commodity of commerce suitable for substantial non-infringing use.

205. Unless enjoined by this Court, Defendants will continue to infringe the 968 Patent and as a direct result the Stryker Plaintiffs will continue to suffer harm, including irreparable harm for which there is no adequate remedy at law. Accordingly, the Stryker Plaintiffs are entitled to injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

206. The Stryker Plaintiffs have suffered and will continue to suffer damage as a direct and proximate result of Defendants' infringement of the 968 Patent. Thus, in addition to injunctive relief, the Stryker Plaintiffs are entitled to recover damages for such infringement pursuant to 35 U.S.C. § 284 in an amount to be proven at trial.

207. On information and belief, the infringement of the 968 Patent by Defendants has been and continues to be willful and deliberate.

208. Defendants have committed and continue to commit all of the above acts of infringement without license or authorization from either of the Stryker Plaintiffs.

209. On information and belief, Defendants have had knowledge of the 968 Patent and knowledge that the iNX Cot is covered by the 968 Patent. As discussed earlier in this Complaint, Defendants have cited at least the 968 Patent, and various other Stryker patents related to the Asserted Patents during prosecution of Defendants' own patent applications. Defendants have

copied and made, offered for sale and sold the iNX Cot knowing of the risk of infringement and/or in view of a risk of infringement that was sufficiently obvious that it should have been known to Defendants. Defendants' infringing actions have been and continue to be willful, entitling the Stryker Plaintiffs to increased damages pursuant to 35 U.S.C. § 284.

210.    Defendants' egregious conduct justifies an increase of three times the damages to be assessed pursuant to 35 U.S.C. § 284, and further qualifies this action as an exceptional case supporting an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

## FOURTH CAUSE OF ACTION
### (Infringement of U.S. 8,056,950)

211.    The Stryker Plaintiffs incorporate the foregoing paragraphs by reference as though set forth fully herein.

212.    Defendants have directly infringed, and continue to directly infringe, literally or under the doctrine of equivalents, at least claims 1-2 and 10 of the 950 Patent by making, using, offering to sell, and/or selling within the United States, and/or by importing into the United States, certain products, including but not limited to the X1 Cot and the iNX Cot, and induced infringement, pursuant to 35 U.S.C. § 271(b), and/or contributed to infringement, pursuant to 35 U.S.C. § 271(c), of the 950 Patent by others, including customers, such as hospitals, EMS providers, and EMS personnel.

213.    On information and belief, the X1 Cot and the iNX Cot meet every limitation, literally or under the doctrine of equivalents, of at least claims 1-2 and 10 of the 950 Patent, and Defendants' making, using, offering for sale, selling and/or importing into the United States the X1 Cot and the iNX Cot directly infringe at least claims 1-2 and 10 of the 950 Patent pursuant to 35 U.S.C. § 271(a).

## X1 Cot

214.     The Stryker Plaintiffs provide the following examples to show that Defendants' X1 Cot infringes claims 1-2 and 10 of the 950 Patent.

215.     Claim 1 of the 950 Patent recites:

1. A combination of an ambulance cot and an ambulance having a cargo area, comprising:

a base frame and a litter frame on said ambulance cot;

a selectively activatable drive mechanism for an elevating mechanism interconnecting said base frame and said litter frame and being configured to effect changes in elevation of said litter frame relative to said base frame; and

a first device located in the cargo area of the ambulance and a second device mounted on said ambulance cot, at least one of said first and second devices being configured (1) to operatively determine the presence and absence of said ambulance cot in said cargo area and (2) to render said drive mechanism inoperative in response to a determination that said ambulance cot is present in said cargo area.

216.     The X1 Cot is intended for use in combination with an ambulance having a cargo area and includes "a base frame and a litter frame on said ambulance cot; [and] a selectively activatable drive mechanism for an elevating mechanism interconnecting said base frame and said litter frame and being configured to effect changes in elevation of said litter frame relative to said base frame." For example, the X1 Literature depicts and instructs:



Litter Frame

Elevating Mechanism

Selectively Activatable Drive Mechanism

Base Frame

(Ex. I1, X1 Sheet, at 1; *see also* Ex. I2, X1 Brochure, at 1.)

The **POWER X1 Ambulance Cot** offers more power, stability, maneuverability, and speed than the leading competitive powered cot.

With an unassisted lift capacity of 700 lb, the POWER X1 is the ultimate solution for both everyday and bariatric transport. Its industry-leading battery technology provides high-powered, reliable performance on every call. The POWER X1 is cross-compatible, as it can be used with a range of fastener systems.

(Ex. I1, X1 Sheet, at 1; *see also* Ex. I2, X1 Brochure, at 1.)

- **700 lb unassisted lift capacity** reduces the strain of everyday and bariatric transport

(Ex. I1, X1 Sheet, at 2; *see also* Ex. I2, X1 Brochure, at 2.)

- **Programmable load height** adjusts to match the height of your ambulance floor

(Ex. I1, X1 Sheet, at 2; *see also* Ex. I2, X1 Brochure, at 2.)

217.    The X1 Cot also includes or otherwise provides for "a first device located in the cargo area of the ambulance." For example, as can be seen from the X1 Literature:

218.    The X1 Cot is configured to fasten to an ambulance via the F1 Fastener (or other compatible fastener). The F1 Fastener (or other compatible fastener) is a first device located in the cargo area of the ambulance.

- **PRO F1 Compatibility Kit** allows you to secure the POWER X1 to the PRO F1 Universal Cot Fastener and Stryker Performance-LOAD™. The POWER X1 is also compatible with FERNO and Stryker antler-and-rail fasteners. See all compatibility information: info.fernoems. com/powerx1-info

(Ex. I1, X1 Sheet, at 2; *see also* Ex. I2, X1 Brochure, at 2.)



**SAE J3027-compliant** for patient and provider safety in the ambulance.

(Ex. J, Fastener Sheet, at 1.)

219.    The X1 Cot also includes or otherwise provides "a second device mounted on said ambulance cot." For example, as illustrated, a second device is mounted on said ambulance cot configured to engage the F1 Fastener:



220.    The X1 Cot also includes or otherwise provides that "at least one of said first and second devices being configured (1) to operatively determine the presence and absence of said ambulance cot in said cargo area and (2) to render said drive mechanism inoperative in response to a determination that said ambulance cot is present in said cargo area." For example, as can be seen from the X1 Literature:

- **Cot Power Lockout:** The POWER X1 power is disabled when it is secured in a powered ICS.

(Ex. K2, Fastener Sheet, at 13.)

221.    Further, Defendants' promotional video posted to YouTube titled "POWER X1 Ambulance Cot Training Video | FERNO" ("Fastener Video") [2] demonstrates use of the F1 Cot with the F1 Fastener. For example, the Fastener Video explains that "[the] vehicle may have been fitted with a FERNO PRO F1 universal cot fastener. If your PRO F1 is fitted with an ICS, integrated Charging System, the POWER X1 will be disabled when mounted in the fastener and the battery will charge."

---

[2] https://www.youtube.com/watch?v=HEyVnXNY__c (last accessed October 10, 2022)



(Fastener Video, at 13:44.)



(Fastener Video, at 13:48.)



(Fastener Video, at 13:54.)

222. Claim 2 of the 950 Patent recites: "The combination according to claim 1, wherein said first device includes an in-ambulance device for securing the ambulance cot in place in said cargo area."

223. The X1 Cot includes the "combination according to claim 1" as explained above. The X1 Cot also includes or otherwise provides that the "first device includes an in-ambulance device for securing the ambulance cot in place in said cargo area." For example, as can be seen from the X1 Literature:

- **PRO F1 Compatibility Kit** allows you to secure the POWER X1 to the PRO F1 Universal Cot Fastener and Stryker Performance-LOAD™. The POWER X1 is also compatible with FERNO and Stryker antler-and-rail fasteners. See all compatibility information: info.fernoems.com/powerx1-info

(Ex. I1, X1 Sheet, at 2; *see also* Ex. I2, X1 Brochure, at 2.)



First Device

**SAE J3027-compliant** for patient
and provider safety in the ambulance.

(Ex. J, Fastener Sheet, at 1.)

224.    Additionally, the Fastener Video explains that "[the] vehicle may have been fitted with a FERNO PRO F1 universal cot fastener. If your PRO F1 is fitted with an ICS, integrated Charging System, the POWER X1 will be disabled when mounted in the fastener and the battery will charge."

225.    Claim 10 of the 950 Patent recites:

> 10. A combination of an ambulance cot and an ambulance having a cargo area, comprising:
>
> a base frame and a litter frame on said ambulance cot;
>
> an elevating mechanism interconnecting said base frame and said litter frame and being configured to effect changes in elevation of said litter frame relative to said base frame;
>
> a selectively activatable drive motor and associated hydraulic pump driven by said drive motor, a hydraulic cylinder connected in fluid circuit with said hydraulic pump, said cylinder having a reciprocal rod operatively connected to said elevating mechanism to effect said changes in elevation of said litter frame relative to said base frame in response to reciprocation of said rod; and
>
> a first device located in the cargo area of the ambulance and a second device mounted on said ambulance cot, at least one of said first and second devices being configured (1) to operatively determine the presence and absence of said ambulance cot in said cargo area and (2) to render said drive motor inoperative in response to a determination that said ambulance cot is present in said cargo area.

226.   The X1 Cot is intended for use in combination with an ambulance having a cargo area and includes "a base frame and a litter frame on said ambulance cot; [and] an elevating mechanism interconnecting said base frame and said litter frame and being configured to effect changes in elevation of said litter frame relative to said base frame." For example, the X1 Literature depicts and instructs:



(Ex. I1, X1 Sheet, at 1; *see also* Ex. I2, X1 Brochure, at 1.)

The **POWER X1 Ambulance Cot** offers more power, stability, maneuverability, and speed than the leading competitive powered cot.

With an unassisted lift capacity of 700 lb, the POWER X1 is the ultimate solution for both everyday and bariatric transport. Its industry-leading battery technology provides high-powered, reliable performance on every call. The POWER X1 is cross-compatible, as it can be used with a range of fastener systems.

(Ex. I1, X1 Sheet, at 1; *see also* Ex. I2, X1 Brochure, at 1.)

- **700 lb unassisted lift capacity** reduces the strain of everyday and bariatric transport

(Ex. I1, X1 Sheet, at 2; *see also* Ex. I2, X1 Brochure, at 2.)

- **Programmable load height** adjusts to match the height of your ambulance floor

(Ex. I1, X1 Sheet, at 2; *see also* Ex. I2, X1 Brochure, at 2.)

227. The X1 Cot also includes or otherwise provides "a selectively activatable drive motor and associated hydraulic pump driven by said drive motor, a hydraulic cylinder connected in fluid circuit with said hydraulic pump, said cylinder having a reciprocal rod operatively connected to said elevating mechanism to effect said changes in elevation of said litter frame relative to said base frame in response to reciprocation of said rod." For example, the X1 Literature depicts:



(Ex. I1, X1 Sheet, at 1; *see also* Ex. I2, X1 Brochure, at 1.)



(Ex. I1, X1 Sheet, at 1; *see also* Ex. I2, X1 Brochure, at 1.)

228. The X1 Cot also includes or otherwise provides "a first device located in the cargo area of the ambulance and a second device mounted on said ambulance cot." For example, the X1 Cot is configured to fasten to an ambulance via the F1 Fastener (or other compatible fastener). The F1 Fastener (or other compatible fastener) is a first device located in the cargo area of the ambulance.

- **PRO F1 Compatibility Kit** allows you to secure the POWER X1 to the PRO F1 Universal Cot Fastener and Stryker Performance-LOAD™. The POWER X1 is also compatible with FERNO and Stryker antler-and-rail fasteners. See all compatibility information: info.fernoems.com/powerx1-info

(Ex. I1, X1 Sheet, at 2; *see also* Ex. I2, X1 Brochure, at 2.)



**SAE J3027-compliant** for patient and provider safety in the ambulance.

(Ex. J, Fastener Sheet, at 1.)

229. The X1 Cot also includes or otherwise provides "a second device mounted on said ambulance cot." For example, as illustrated, a second device is mounted on said ambulance cot configured to engage the F1 Fastener:



230.     The X1 Cot also includes or otherwise provides that "at least one of said first and second devices being configured (1) to operatively determine the presence and absence of said ambulance cot in said cargo area and (2) to render said drive motor inoperative in response to a determination that said ambulance cot is present in said cargo area." For example, the X1 Literature depicts:

231.     Defendants' promotional video posted to YouTube titled "POWER X1 Ambulance Cot Training Video | FERNO" ("Fastener Video") [3] demonstrates use of the F1 Cot with the F1 Fastener. For example, the Fastener Video explains that "[the] vehicle may have been fitted with a FERNO PRO F1 universal cot fastener. If your PRO F1 is fitted with an ICS, integrated Charging System, the POWER X1 will be disabled when mounted in the fastener and the battery will charge."

---

[3] https://www.youtube.com/watch?v=HEyVnXNY__c  (last accessed October 10, 2022)



(Fastener Video, at 13:44.)



(Fastener Video, at 13:48.)



(Fastener Video, at 13:54.)

## iNX Cot

232.    Similarly, the Stryker Plaintiffs provide the following examples to show that Defendants' iNX Cot infringes claims 1-2 and 10 of the 950 Patent.

233.    Claim 1 of the 950 Patent recites:

>    1. A combination of an ambulance cot and an ambulance having a cargo area, comprising:
>
>    a base frame and a litter frame on said ambulance cot;
>
>    a selectively activatable drive mechanism for an elevating mechanism interconnecting said base frame and said litter frame and being configured to effect changes in elevation of said litter frame relative to said base frame; and
>
>    a first device located in the cargo area of the ambulance and a second device mounted on said ambulance cot, at least one of said first and second devices being configured (1) to operatively determine the presence and absence of said ambulance cot in said cargo area and (2) to render said drive mechanism inoperative in response to a determination that said ambulance cot is present in said cargo area.

234.    The iNX Cot is intended for use in combination with an ambulance having a cargo area and includes "a base frame and a litter frame on said ambulance cot; [and] a selectively activatable drive mechanism for an elevating mechanism interconnecting said base frame and said

litter frame and being configured to effect changes in elevation of said litter frame relative to said base frame." For example, the iNX Literature depicts and instructs:



(Ex. J1, iNX Sheet, at 1; *see also* Ex. J2, iNX Brochure, at 1.)

> Everyday operations in EMS—like transferring patients or loading and unloading cots from an ambulance—put tremendous strain on the backs of EMS professionals.
>
> The **iNX Integrated Patient Transport & Loading System** is the only system designed to enhance the safety of both patients and EMS professionals by effectively eliminating lifting. Now EMS professionals can lift, lower, load, and unload with the push of a button, taking the strain off of their backs.

(Ex. J1, iNX Sheet, at 1; *see also* Ex. J2, iNX Brochure, at 1.)

> • Dual, powered actuators maximize tip-stability and can lift patient loads up to 700 lb

(Ex. J1, iNX Sheet, at 2; *see also* Ex. J2, iNX Brochure, at 2.)

235. The iNX Cot is configured to fasten to an ambulance via a fastener (e.g., the Ferno iNLINE Fastening System ("InLine Fastener")). The InLine Fastener (or other compatible fastener) includes a first device located in the cargo area of the ambulance.



(Ex. J3, iNX Manual, at 21.)

• **SAE J3027 compliant** when you combine the iN∫X with the iN∫LINE Fastening System

(Ex. J1, iNX Sheet, at 1; *see also* Ex. J2, iNX Brochure, at 1.)

236.    The iNX Cot also includes or otherwise provides "a second device mounted on said ambulance cot." For example, as illustrated, a second device is mounted on said ambulance cot configured to engage the InLine Fastener:



(Ex. J3, iNX Manual, at 21.)



237.    The iNX Cot also includes or otherwise provides that "at least one of said first and second devices being configured (1) to operatively determine the presence and absence of said ambulance cot in said cargo area and (2) to render said drive mechanism inoperative in response to a determination that said ambulance cot is present in said cargo area." For example, the iNX Literature depicts and instructs:

- ## In-fastener shut-off prevents accidental operation in the ambulance

(Ex. J1, iNX Sheet, at 2; *see also* Ex. J2, iNX Brochure, at 2.)

### 4.12  Integrated Charging System (ICS®)

The Ferno® Integrated Charging System (ICS®), disables powered operation when the iNX is locked in the iNLINE (Figure 12) and the ICS is connected and powered. The ambulance ignition, inverter, and/or outlet switch may need to be turned ON to supply electrical power to the ICS.

(Ex. J3, iNX Manual, at 21.)

238. Claim 2 of the 950 Patent recites: "The combination according to claim 1, wherein said first device includes an in-ambulance device for securing the ambulance cot in place in said cargo area."

239. The iNX Cot includes the "combination according to claim 1" as explained above. The iNX Cot also includes or otherwise provides that the "first device includes an in-ambulance device for securing the ambulance cot in place in said cargo area." For example, as can be seen from the iNX Literature:



(Ex. J3, iNX Manual, at 21.)

• **SAE J3027 compliant** when you combine the iN∫X with the iN∫LINE Fastening System

(Ex. J1, iNX Sheet, at 1; *see also* Ex. J2, iNX Brochure, at 1.)



(Ex. J3, iNX Manual, at 21.)

240. Claim 10 of the 950 Patent recites:

10. A combination of an ambulance cot and an ambulance having a cargo area, comprising:

a base frame and a litter frame on said ambulance cot;

an elevating mechanism interconnecting said base frame and said litter frame and being configured to effect changes in elevation of said litter frame relative to said base frame;

a selectively activatable drive motor and associated hydraulic pump driven by said drive motor, a hydraulic cylinder connected in fluid circuit with said hydraulic pump, said cylinder having a reciprocal rod operatively connected to said elevating mechanism to effect said changes in elevation of said litter frame relative to said base frame in response to reciprocation of said rod; and

a first device located in the cargo area of the ambulance and a second device mounted on said ambulance cot, at least one of said first and second devices being configured (1) to operatively determine the presence and absence of said ambulance cot in said cargo area and (2) to render said drive motor inoperative in response to a determination that said ambulance cot is present in said cargo area.

241. The iNX Cot is intended for use in combination with an ambulance having a cargo area and includes "a base frame and a litter frame on said ambulance cot; [and] an elevating mechanism interconnecting said base frame and said litter frame and being configured to effect changes in elevation of said litter frame relative to said base frame." For example, the iNX Literature depicts and instructs:



(Ex. J1, iNX Sheet, at 1; *see also* Ex. J2, iNX Brochure, at 1.)

> Everyday operations in EMS—like transferring patients or loading and unloading cots from an ambulance—put tremendous strain on the backs of EMS professionals.
>
> The **iNX Integrated Patient Transport & Loading System** is the only system designed to enhance the safety of both patients and EMS professionals by effectively eliminating lifting. Now EMS professionals can lift, lower, load, and unload with the push of a button, taking the strain off of their backs.

(Ex. J1, iNX Sheet, at 1; *see also* Ex. J2, iNX Brochure, at 1.)

- Dual, powered actuators maximize tip-stability and can lift patient loads up to 700 lb

(Ex. J1, iNX Sheet, at 2; *see also* Ex. J2, iNX Brochure, at 2.)

242. The iNX Cot also includes or otherwise provides "a selectively activatable drive motor and associated hydraulic pump driven by said drive motor, a hydraulic cylinder connected in fluid circuit with said hydraulic pump, said cylinder having a reciprocal rod operatively connected to said elevating mechanism to effect said changes in elevation of said litter frame relative to said base frame in response to reciprocation of said rod." For example, the iNX Literature depicts:

## 2.2 Operator Height and Strength

The iNʃX is designed to minimize the need for lifting. Whenever possible, use the powered hydraulic system to:

- Extend and retract the legs.
- Load the iNʃX into and unload it from an ambulance.
- Transition between surfaces of varying levels.
- Place the iNʃX at good height to establish a proper, ergonomic grasping position for the operators.

An excessive load (exceeding the 700 lb/318 kg load capacity) or non-powered operation may require the operators to lift a portion of the load. Use additional help as needed. See "Using Additional Help" on page 10.

(Ex. J3, iNX Manual, at 8.)

- **ACTUATOR:** The actuator is a hydraulic system that extends and retracts the iNʃX legs. One actuator is attached to each set of legs.

(Ex. J3, iNX Manual, at 11.)

243. The iNX Cot also includes or otherwise provides "a first device located in the cargo area of the ambulance and a second device mounted on said ambulance cot." For example, the iNX Cot is configured to fasten to an ambulance via the InLine Fastener (or other compatible fastener). The InLine Fastener (or other compatible fastener) is a first device located in the cargo area of the ambulance. The iNX Cot includes an attachment mechanism that serves as the second device.



(Ex. J3, iNX Manual, at 21.)



244.    The iNX Cot also includes or otherwise provides that "at least one of said first and second devices being configured (1) to operatively determine the presence and absence of said ambulance cot in said cargo area and (2) to render said drive motor inoperative in response to a determination that said ambulance cot is present in said cargo area." For example, the iNX Literature depicts:

- In-fastener shut-off prevents accidental operation in the ambulance

(Ex. J1, iNX Sheet, at 2; *see also* Ex. J2, iNX Brochure, at 2.)

### 4.12 Integrated Charging System (ICS®)

The Ferno® Integrated Charging System (ICS®), disables powered operation when the iNX is locked in the iNLINE (Figure 12) and the ICS is connected and powered. The ambulance ignition, inverter, and/or outlet switch may need to be turned ON to supply electrical power to the ICS.

(Ex. J3, iNX Manual, at 21.)

245. Defendants have also indirectly infringed and continue to indirectly infringe at least claims 1-2 and 10 of the 950 Patent by inducing infringement pursuant to 35 U.S.C. § 271(b) and/or contributing to infringement pursuant to 35 U.S.C. § 271(c).

246. On information and belief, Defendants' customers directly infringe the 950 Patent. For example, when the X1 Cot and the iNX Cot are sold to Defendants' customers, such as hospitals, EMS providers, and EMS personnel, those customers infringe at least claims 1-2 and 10 of the 950 Patent through the use of the X1 Cot and the iNX Cot.

247. On information and belief, Defendants have directed and direct third parties, including customers and other users, in the United States, to use the X1 Cot and the iNX Cot, which directly infringe the 950 Patent and which Defendants know infringe the 950 Patent. Defendants provide instructions to third parties including customers, such as hospitals, EMS providers, and EMS personnel, on how to use the Accused Products in a manner that Defendants know practices the claimed inventions. For example, as described above, Defendants' promotional

materials and guides describe how to use the X1 Cot and the iNX Cot. The promotional materials and guides highlight the infringing features to customers, such as hospitals, EMS providers, and EMS personnel. Example promotional materials and guides are attached to this Complaint as Exhibits I through L.

248. On information and belief, in violation of 35 U.S.C. § 271(b), Defendants specifically intend to induce infringement of the 950 Patent by their customers and users of the X1 Cot and the iNX Cot and have knowledge that the inducing acts would cause infringement or were willfully blind to the possibility that their inducing acts would cause infringement. As discussed earlier in this Complaint, Defendants have cited at least the 950 Patent, and various other Stryker patents related to the Asserted Patents during prosecution of Defendants' own patent applications.

249. On information and belief, at all relevant times, Defendants knew or were willfully blind to how the X1 Cot and the iNX Cot infringe the 950 Patent. Defendants have been and are actively inducing infringement of the 950 Patent by actively and knowingly inducing third parties such as customers (e.g., hospitals, EMS providers, and EMS personnel) to commit acts that Defendants know constitute infringement of the 950 Patent.

250. On information and belief, Defendants actively and knowingly intended to aid, abet, direct, encourage, or otherwise instruct such third parties by Defendants' offer for sale and sale of the X1 Cot and the iNX Cot and instructions to infringe the 950 Patent. Defendants encourage infringement by customers at least by providing product promotional materials and guides, as discussed above, that instruct users on how to use the X1 Cot and the iNX Cot in an infringing manner. Defendants have and continue to specifically intend to induce infringement of the 950 Patent.

251. On information and belief, despite Defendants' knowledge of the 950 Patent and knowledge that customers will necessarily infringe the 950 Patent when the X1 Cot and the iNX Cot are used as instructed, Defendants have encouraged, and continue to encourage, infringement.

252. Defendants also contribute to infringement of the 950 Patent by Defendants' customers in violation of 35 U.S.C. §271(c). On information and belief, Defendants were aware of the 950 Patent at all relevant times, as discussed above. Defendants sell and offer for sale within the United States the X1 Cot and the iNX Cot knowing that they constitute a material part of the claimed inventions of the 950 Patent, knowing that the X1 Cot and the iNX Cot are especially made or especially adapted for use in infringing the 950 Patent, and knowing that the X1 Cot and the iNX Cot are not a staple article or commodity of commerce suitable for substantial non-infringing use.

253. Unless enjoined by this Court, Defendants will continue to infringe the 950 Patent and as a direct result the Stryker Plaintiffs will continue to suffer harm, including irreparable harm for which there is no adequate remedy at law. Accordingly, the Stryker Plaintiffs are entitled to injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

254. The Stryker Plaintiffs have suffered and will continue to suffer damage as a direct and proximate result of Defendants' infringement of the 950 Patent. Thus, in addition to injunctive relief, the Stryker Plaintiffs are entitled to recover damages for such infringement pursuant to 35 U.S.C. § 284 in an amount to be proven at trial.

255. On information and belief, the infringement of the 950 Patent by Defendants has been and continues to be willful and deliberate.

256. Defendants have committed and continue to commit all of the above acts of infringement without license or authorization from either of the Stryker Plaintiffs.

257.     On information and belief, Defendants have had knowledge of the 950 Patent and knowledge that the X1 Cot and the iNX Cot are covered by the 950 Patent. As discussed earlier in this Complaint, Defendants have cited at least the 950 Patent, and various other Stryker patents related to the Asserted Patents during prosecution of Defendants' own patent applications. Defendants have copied and made, offered for sale and sold the X1 Cot and the iNX Cot knowing of the risk of infringement and/or in view of a risk of infringement that was sufficiently obvious that it should have been known to Defendants. Defendants' infringing actions have been and continue to be willful, entitling the Stryker Plaintiffs to increased damages pursuant to 35 U.S.C. § 284.

258.     Defendants' egregious conduct justifies an increase of three times the damages to be assessed pursuant to 35 U.S.C. § 284, and further qualifies this action as an exceptional case supporting an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

## FIFTH CAUSE OF ACTION
### (Infringement of U.S. 10,058,464)

259.     The Stryker Plaintiffs incorporate the foregoing paragraphs by reference as though set forth fully herein.

260.     Defendants have directly infringed, and continue to directly infringe, literally or under the doctrine of equivalents, at least claims 1-3, 7-19, and 21 of the 464 Patent by making, using, offering to sell, and/or selling within the United States, and/or by importing into the United States, certain products, including but not limited to the F1 Fastener, and induced infringement, pursuant to 35 U.S.C. § 271(b), and/or contributed to infringement, pursuant to 35 U.S.C. § 271(c), of the 464 Patent by others, including customers, such as hospitals, EMS providers, and EMS personnel.

261.    On information and belief, the F1 Fastener meets every limitation, literally or under the doctrine of equivalents, of at least claims 1-3, 7-19, and 21 of the 464 Patent, and Defendants' making, using, offering for sale, selling and/or importing into the United States the F1 Fastener directly infringes at least claims 1-3, 7-19, and 21 of the 464 Patent pursuant to 35 U.S.C. § 271(a).

262.    The Stryker Plaintiffs provide the following examples to show that Defendants' F1 Fastener infringes claims 1-3, 7-19, and 21 of the 464 Patent.

263.    Claim 1 of the 464 Patent recites:

1. A cot fastening system for fastening a cot, the cot having a foot end, a head end, a pair of head end load wheels, a head end cot attachment, a foot end cot attachment, and a safety bar, the head end load wheels having a load wheel spacing, and the head end load wheels being spaced a distance from the head end cot attachment, said cot fastening system comprising:

a frame configured for mounting to a floor of an emergency vehicle, the frame having a longitudinal axis and a cot loading direction along said longitudinal axis;

a stationary first restraint assembly for coupling to the foot end cot attachment, said first restraint assembly mounted to said frame in a fixed position;

a second restraint assembly for coupling to the head end cot attachment, said second restraint assembly mounted to said frame; and

wherein said frame includes a first section and a second section, said first section having a first width less than the load wheel spacing to allow the cot to straddle the frame, said first section comprising linear portions extending along said longitudinal axis from said first restraint assembly toward said second restraint assembly, and said second section extending from said linear portions of said first section along said longitudinal axis of said frame and diverging away from said longitudinal axis of said frame to a second width greater than said first width but less than the load wheel spacing between the head end load wheels to form a guide for guiding the head end load wheels of the cot when the head end cot attachment has passed the first restraint assembly.

264.    The F1 Fastener is a cot fastening system for fastening a cot that includes "a foot end, a head end, a pair of head end load wheels, a head end cot attachment, a foot end cot

117

attachment, and a safety bar, the head end load wheels having a load wheel spacing, and the head end load wheels being spaced a distance from the head end cot attachment." For example, the Fastener Literature depicts and instructs that the F1 Fastener is compatible with at least the Defendants' X1 Cot (illustrated below), Stryker's Power-PRO XT, and Stryker's Performance-PRO XT ambulance cots ("Compatible Cots"). Each of said Compatible Cots having a foot end, a head end, a pair of head end load wheels, a head end cot attachment, a foot end cot attachment, and a safety bar, the head end load wheels having a load wheel spacing, and the head end load wheels being spaced a distance from the head end cot attachment.

The dynamically crash-tested **PRO F1 Universal Cot Fastener** is the first truly SAE-compliant cross-compatible fastening system. It is designed for use with:

  

With the PRO F1, you can easily exchange cots between the vehicles in your fleet as needed, knowing that they will be safely secured in compliance with crash-test standards.

(Ex. K1, Fastener Sheet, at 1.)



(Ex. I1, X1 Sheet, at 2; *see also* Ex. I2, X1 Brochure, at 2.)

265.   The F1 Fastener also includes or otherwise provides "a frame configured for mounting to a floor of an emergency vehicle, the frame having a longitudinal axis and a cot loading direction along said longitudinal axis." For example, the Fastener Literature depicts:



(Ex. K1, Fastener Sheet, at 1.)

266.   The F1 Fastener also includes or otherwise provides "a stationary first restraint assembly for coupling to the foot end cot attachment, said first restraint assembly mounted to said frame in a fixed position." For example, the Fastener Literature depicts:



(Ex. K1, Fastener Sheet, at 1.)

267.    The F1 Fastener also includes or otherwise provides "a second restraint assembly for coupling to the head end cot attachment, said second restraint assembly mounted to said frame." For example, the Fastener Literature depicts:



(Ex. K1, Fastener Sheet, at 1.)

268.    The F1 Fastener also includes or otherwise provides "wherein said frame includes a first section and a second section, said first section having a first width less than the load wheel spacing to allow the cot to straddle the frame." For example, the Fastener Literature depicts:



(Ex. K1, Fastener Sheet, at 1.)



(Ex. K1, Fastener Sheet, at 1.)

269. The F1 Fastener also includes or otherwise provides that "said first section comprising linear portions extending along said longitudinal axis from said first restraint assembly toward said second restraint assembly." For example, the Fastener Literature depicts:



(Ex. K1, Fastener Sheet, at 1.)

270. The F1 Fastener also includes or otherwise provides that "said second section extending from said linear portions of said first section along said longitudinal axis of said frame and diverging away from said longitudinal axis of said frame to a second width greater than said

first width but less than the load wheel spacing between the head end load wheels to form a guide for guiding the head end load wheels of the cot when the head end cot attachment has passed the first restraint assembly." For example, the Fastener Literature depicts:



(Ex. K1, Fastener Sheet, at 1.)

271. Claim 2 of the 464 Patent recites: "The cot fastening system according to claim 1, further comprising a first mount mounting said first restraint assembly to said frame, and a second mount mounting said second restraint assembly to said frame, said frame extending between said first and second mounts."

272. The F1 Fastener is an integral component of the "cot fastening system according to claim 1" as explained above. The F1 Fastener also includes or otherwise provides "a first mount mounting said first restraint assembly to said frame, and a second mount mounting said second restraint assembly to said frame, said frame extending between said first and second mounts." For example, as can be seen from the Fastener Literature:



(Ex. K1, Fastener Sheet, at 1.)



(Ex. K2, Fastener Sheet, at 10.)

273.    Claim 3 of the 464 Patent recites: "The cot fastening system according to claim 2, wherein said second restraint assembly includes a catch, and said second mount comprises a second mount guide surface for guiding the head end cot attachment into alignment with said catch of said second restraint assembly."

274.    The F1 Fastener is an integral component of the "cot fastening system according to claim 2" as explained above. The F1 Fastener also includes or otherwise provides that "said second restraint assembly includes a catch, and said second mount comprises a second mount guide surface for guiding the head end cot attachment into alignment with said catch of said second restraint assembly." For example, as can be seen from the Fastener Literature:



275.    Claim 7 of the 464 Patent recites: "The cot fastening system according to claim 2, further comprising a guide member extending between said first and second mounts, said guide

member for guiding the safety bar and for maintaining the safety bar in a non-deployed position while the cot is moved along the frame."

276.    The F1 Fastener is an integral component of the "cot fastening system according to claim 2" as explained above. The F1 Fastener also includes or otherwise provides "a guide member extending between said first and second mounts, said guide member for guiding the safety bar and for maintaining the safety bar in a non-deployed position while the cot is moved along the frame." For example, as can be seen from the Fastener Literature:



277.    Claim 8 of the 464 Patent recites:

8. A cot fastening system for fastening a cot, the cot having a foot end, a head end, a pair of head end load wheels, a head end cot attachment, a foot end cot attachment, and a safety bar, the head end load wheels having a load wheel spacing, and the head end load wheels being spaced a distance from the head end cot attachment, said system comprising:

a frame configured for mounting to a floor of an emergency vehicle, the frame having a longitudinal axis and a cot loading direction along said longitudinal axis;

a first restraint assembly for coupling to the foot end cot attachment, said first restraint assembly mounted to said frame;

a second restraint assembly for coupling to the head end cot attachment, said second restraint assembly mounted to said frame; and

wherein said frame includes a first section and a second section, said first section having a first width less than the load wheel spacing to allow

the cot to straddle the frame, and the second section extending from said first section along said longitudinal axis of said frame and diverging away from said longitudinal axis of said frame to a second width greater than said first width but less than the load wheel spacing to form a guide for guiding the head end load wheels of the cot when the head end cot attachment has passed the first restraint assembly; and

a spring for biasing the cot in a direction opposed to said cot loading direction.

278.    The F1 Fastener is a cot fastening system for fastening a cot that includes "a foot end, a head end, a pair of head end load wheels, a head end cot attachment, a foot end cot attachment, and a safety bar, the head end load wheels having a load wheel spacing, and the head end load wheels being spaced a distance from the head end cot attachment." For example, the Fastener Literature depicts and instructs that the F1 Fastener is compatible with at least the Compatible Cots. Each of said Compatible Cots having a foot end, a head end, a pair of head end load wheels, a head end cot attachment, a foot end cot attachment, and a safety bar, the head end load wheels having a load wheel spacing, and the head end load wheels being spaced a distance from the head end cot attachment.

  

(Ex. K1, Fastener Sheet, at 1.)



(Ex. I1, X1 Sheet, at 2; *see also* Ex. I2, X1 Brochure, at 2.)

279.    The F1 Fastener also includes or otherwise provides "a frame configured for mounting to a floor of an emergency vehicle, the frame having a longitudinal axis and a cot loading direction along said longitudinal axis." For example, as can be seen from the Fastener Literature:



(Ex. K1, Fastener Sheet, at 1.)

280.    The F1 Fastener also includes or otherwise provides "a first restraint assembly for coupling to the foot end cot attachment, said first restraint assembly mounted to said frame." For example, as can be seen from the Fastener Literature:



(Ex. K1, Fastener Sheet, at 1.)

281.    The F1 Fastener also includes or otherwise provides "a second restraint assembly for coupling to the head end cot attachment, said second restraint assembly mounted to said frame." For example, as can be seen from the Fastener Literature:



(Ex. K1, Fastener Sheet, at 1.)

282.    The F1 Fastener also includes or otherwise provides that "said frame includes a first section and a second section, said first section having a first width less than the load wheel spacing to allow the cot to straddle the frame." For example, as can be seen from the Fastener Literature:



(Ex. K1, Fastener Sheet, at 1.)



(Ex. K1, Fastener Sheet, at 1.)

283. The F1 Fastener also includes or otherwise provides that "the second section extending from said first section along said longitudinal axis of said frame and diverging away from said longitudinal axis of said frame to a second width greater than said first width but less than the load wheel spacing to form a guide for guiding the head end load wheels of the cot when the head end cot attachment has passed the first restraint assembly." For example, as can be seen from the Fastener Literature:



(Ex. K1, Fastener Sheet, at 1.)

284.    The F1 Fastener also includes or otherwise provides "a spring for biasing the cot in a direction opposed to said cot loading direction." For example, as can be seen from the Fastener Literature:



285. Claim 9 of the 464 Patent recites: "The cot fastening system according to claim 1 further comprising a spring configured to apply a pre-load on at least one of said restraint assemblies."

286. The F1 Fastener is an integral component of the "cot fastening system according to claim 1" as explained above. The F1 Fastener also includes or otherwise provides "a spring configured to apply a pre-load on at least one of said restraint assemblies." For example, as can be seen from the Fastener Literature:



287. Claim 10 of the 464 Patent recites: "The cot fastening system according to claim 9, wherein said at least one of said restraint assemblies comprises a latch, and said spring operable for biasing one of the cot attachments into engagement with said latch."

288. The F1 Fastener is an integral component of the "cot fastening system according to claim 9" as explained above. The F1 Fastener also includes or otherwise provides that "said at least one of said restraint assemblies comprises a latch, and said spring operable for biasing one of

the cot attachments into engagement with said latch." For example, the F1 Fastener includes a spring operable for biasing one of the cot attachments into engagement with said latch.





(Ex. J3, iNX Manual, at 15.)

289.    Claim 11 of the 464 Patent recites: "The cot fastening system according to claim 8, wherein said second restraint assembly includes said spring."

290.    The F1 Fastener is an integral component of the "cot fastening system according to claim 11" as explained above. The F1 Fastener also includes or otherwise provides that "said second restraint assembly includes said spring." For example, as can be seen from the Fastener Literature:



291.    Claim 12 of the 464 Patent recites: "The cot fastening system according to claim 11, wherein one of said restraint assemblies comprises a pair of spring biased arms for engaging one of the cot attachments."

292.    The F1 Fastener is an integral component of the "cot fastening system according to claim 11" as explained above. The F1 Fastener also includes or otherwise provides that "one of said restraint assemblies comprises a pair of spring biased arms for engaging one of the cot attachments." For example, as can be seen from the Fastener Literature:





293.    Claim 13 of the 464 Patent recites: "The cot fastening system according to claim 12, wherein each of said spring biased arms is pivotally mounted about a vertical axis."

294. The F1 Fastener is an integral component of the "cot fastening system according to claim 12" as explained above. The F1 Fastener also includes or otherwise provides that "each of said spring biased arms is pivotally mounted about a vertical axis." For example, as can be seen from the Fastener Literature:



295. Claim 14 of the 464 Patent recites: "The cot fastening system according to claim 1, wherein at least one restraint assembly of said first restraint assembly and said second restraint assembly includes a pair of opposed arms, each arm of said pair of opposed arms comprising a first end and a second end, each of said first ends being pivotally mounted about a pivot axis, and each of said second ends having a bearing surface for being engaged by one cot attachment of the cot attachments, and said arms configured to prohibit the one cot attachment from being released when the one cot attachment applies a compression force on said bearing surfaces of said arms."

296. The F1 Fastener is an integral component of the "cot fastening system according to claim 1" as explained above. The F1 Fastener also includes or otherwise provides that "at least one restraint assembly of said first restraint assembly and said second restraint assembly includes a pair of opposed arms, each arm of said pair of opposed arms comprising a first end and a second end, each of said first ends being pivotally mounted about a pivot axis, and each of said second ends having a bearing surface for being engaged by one cot attachment of the cot attachments, and said arms configured to prohibit the one cot attachment from being released when the one cot attachment applies a compression force on said bearing surfaces of said arms." For example, as can be seen from the Fastener Literature:



(Ex. K2, Fastener Sheet, at 15.)





297.    Claim 15 of the 464 Patent recites: "The cot fastening system according to claim 14, wherein said arms are biased toward each other by springs."

298.    The F1 Fastener is an integral component of the "cot fastening system according to claim 14" as explained above. The F1 Fastener also includes or otherwise provides that "said arms are biased toward each other by springs." On information and belief, a spring is used to bias the pair of biased arms.



299.    Claim 16 of the 464 Patent recites: "The cot fastening system according to claim 14, wherein said pivot axes are orthogonal to the cot loading direction."

300.    The F1 Fastener is an integral component of the "cot fastening system according to claim 14" as explained above. The F1 Fastener also includes or otherwise provides that "said pivot axes are orthogonal to the cot loading direction." For example, as can be seen from the Fastener Literature, the vertical axis is orthogonal to the loading direction:



301.    Claim 17 of the 464 Patent recites: "The cot fastening system according to claim 14, wherein said at least one restraint assembly comprises the first restraint assembly."

302.    The F1 Fastener is an integral component of the "cot fastening system according to claim 14" as explained above. The F1 Fastener also includes or otherwise provides that "said at least one restraint assembly comprises the first restraint assembly." For example, as can be seen from the Fastener Literature, the at least one restraint assembly of claim 14 in the case of the F1 Fastener is the first restraint assembly.



First Restraint
Assembly

(Ex. K1, Fastener Sheet, at 1.)

303.    Claim 18 of the 464 Patent recites: "The cot fastening system according to claim 17, further comprising a spring for biasing the cot in a direction opposed from said cot loading direction."

304.    The F1 Fastener is an integral component of the "cot fastening system according to claim 17" as explained above. The F1 Fastener also includes or otherwise provides "a spring for biasing the cot in a direction opposed from said cot loading direction." For example, as can be seen from the Fastener Literature:



305.    Claim 19 of the 464 Patent recites: "The cot fastening system according to claim 18, wherein said spring is operable to bias the foot end cot attachment toward said first restraint assembly."

306.    The F1 Fastener is an integral component of the "cot fastening system according to claim 18" as explained above. The F1 Fastener also includes or otherwise provides that "said spring is operable to bias the foot end cot attachment toward said first restraint assembly." On information and belief, the F1 Fastener comprises a spring that is operable to bias the foot end cot attachment toward said first restraint assembly. The spring biases the cot into the pair of opposed arms.



307. Claim 21 of the 464 Patent recites: "The cot fastening system according to claim 14, further comprising a release mechanism for selectively releasing said at least one restraint assembly, and said release mechanism including an overload spring to prevent said release mechanism from being overloaded when pressure is applied to the bearing surfaces of said arms of said at least one restraint assembly."

308. The F1 Fastener is an integral component of the "cot fastening system according to claim 14" as explained above. The F1 Fastener also includes or otherwise provides "a release mechanism for selectively releasing said at least one restraint assembly." On information and belief, the release mechanism includes an overload spring to prevent said release mechanism from being overloaded when pressure is applied to the bearing surfaces of said arms of said at least one restraint assembly.



(Ex. J3, Fastener Manual, at 15.)

309.  Defendants have also indirectly infringed and continue to indirectly infringe at least claims 1-3, 7-19, and 21 of the 464 Patent by inducing infringement pursuant to 35 U.S.C. § 271(b) and/or contributing to infringement pursuant to 35 U.S.C. § 271(c).

310.  On information and belief, Defendants' customers directly infringe the 464 Patent. For example, when the F1 Fastener is sold to Defendants' customers, such as hospitals, EMS providers, and EMS personnel, those customers infringe at least claims 1-3, 7-19, and 21 of the 464 Patent through the use of the F1 Fastener.

311.  On information and belief, Defendants have directed and direct third parties, including customers and other users, in the United States, to use the F1 Fastener, which directly infringe the 464 Patent and which Defendants know infringes the 464 Patent. Defendants provide instructions to third parties including customers, such as hospitals, EMS providers, and EMS personnel, on how to use the Accused Products in a manner that Defendants know practices the claimed inventions. For example, as described above, Defendants' promotional materials and

guides describe how to use the F1 Fastener. The promotional materials and guides highlight the infringing features to customers, such as hospitals, EMS providers, and EMS personnel. Example promotional materials and guides are attached to this Complaint as Exhibits I through L.

312.   On information and belief, in violation of 35 U.S.C. § 271(b), Defendants specifically intend to induce infringement of the 464 Patent by their customers and users of the F1 Fastener and have knowledge that the inducing acts would cause infringement or were willfully blind to the possibility that their inducing acts would cause infringement. As discussed earlier in this Complaint, Defendants have cited at least the 464 Patent, and various other Stryker patents related to the Asserted Patents during prosecution of Defendants' own patent applications.

313.   On information and belief, at all relevant times, Defendants knew or were willfully blind to how the F1 Fastener infringes the 464 Patent. Defendants have been and are actively inducing infringement of the 464 Patent by actively and knowingly inducing third parties such as customers (e.g., hospitals, EMS providers, and EMS personnel) to commit acts that Defendants know constitute infringement of the 464 Patent.

314.   On information and belief, Defendants actively and knowingly intended to aid, abet, direct, encourage, or otherwise instruct such third parties by Defendants' offer for sale and sale of the F1 Fastener and instructions to infringe the 464 Patent. Defendants encourage infringement by customers at least by providing product promotional materials and guides, as discussed above, that instruct users on how to use the F1 Fastener in an infringing manner. Defendants have and continue to specifically intend to induce infringement of the 464 Patent.

315.   On information and belief, despite Defendants' knowledge of the 464 Patent and knowledge that customers will necessarily infringe the 464 Patent when the F1 Fastener is used as instructed, Defendants have encouraged, and continue to encourage, infringement.

316. Defendants also contribute to infringement of the 464 Patent by Defendants' customers in violation of 35 U.S.C. §271(c). On information and belief, Defendants were aware of the 464 Patent at all relevant times, as discussed above. Defendants sell and offer for sale within the United States the F1 Fastener knowing that they constitute a material part of the claimed inventions of the 464 Patent, knowing that the F1 Fastener is especially made or especially adapted for use in infringing the 464 Patent, and knowing that the F1 Fastener is not a staple article or commodity of commerce suitable for substantial non-infringing use.

317. Unless enjoined by this Court, Defendants will continue to infringe the 464 Patent and as a direct result the Stryker Plaintiffs will continue to suffer harm, including irreparable harm for which there is no adequate remedy at law. Accordingly, the Stryker Plaintiffs are entitled to injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

318. The Stryker Plaintiffs have suffered and will continue to suffer damage as a direct and proximate result of Defendants' infringement of the 464 Patent. Thus, in addition to injunctive relief, the Stryker Plaintiffs are entitled to recover damages for such infringement pursuant to 35 U.S.C. § 284 in an amount to be proven at trial.

319. On information and belief, the infringement of the 464 Patent by Defendants has been and continues to be willful and deliberate.

320. Defendants have committed and continue to commit all of the above acts of infringement without license or authorization from either of the Stryker Plaintiffs.

321. On information and belief, Defendants have had knowledge of the 464 Patent and knowledge that the F1 Fastener is covered by the 464 Patent. As discussed earlier in this Complaint, Defendants have cited at least the 464 Patent, and various other Stryker patents related to the Asserted Patents during prosecution of Defendants' own patent applications. Defendants

have copied and made, offered for sale and sold the F1 Fastener knowing of the risk of infringement and/or in view of a risk of infringement that was sufficiently obvious that it should have been known to Defendants. Defendants' infringing actions have been and continue to be willful, entitling the Stryker Plaintiffs to increased damages pursuant to 35 U.S.C. § 284.

322. Defendants' egregious conduct justifies an increase of three times the damages to be assessed pursuant to 35 U.S.C. § 284, and further qualifies this action as an exceptional case supporting an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

**SIXTH CAUSE OF ACTION**
**<u>(Infringement of U.S. D794,205)</u>**

323. The Stryker Plaintiffs incorporate the foregoing paragraphs by reference as though set forth fully herein.

324. Defendants have directly infringed and are directly infringing the 205 Design Patent by selling and/or offering to sell within the United States and/or importing into the United States the F1 Fastener embodying the invention defined by the 205 Design Patent in violation of 35 U.S.C. § 271(a) without authority of Stryker.

325. Defendants' F1 Fastener infringes the 205 Design Patent inasmuch as it has an overall visual appearance that is substantially the same as the overall visual appearance of the design claimed in the 205 Design Patent.

326. An ordinary observer or purchaser would find the overall appearance of the 205 Design Patent and F1 Fastener substantially similar. As shown below, the F1 Fastener includes key visual features from and is substantially similar in overall appearance to the design claimed in the 205 Design Patent.



| 205 Design Patent | F1 Fastener |
|---|---|



327.    Defendants have also indirectly infringed and continue to indirectly infringe the claimed design of the 205 Design Patent by inducing infringement pursuant to 35 U.S.C. § 271(b) and/or contributing to infringement pursuant to 35 U.S.C. § 271(c).

328.    On information and belief, Defendants' customers directly infringe the 205 Design Patent and Defendants knowingly induce customers to use its F1 Fastener, including, for example, by promoting the F1 Fastener for use and providing customers with instructions for using them. For example, when the F1 Fastener is sold to Defendants' customers, such as hospitals, EMS providers, and EMS personnel, those customers infringe the claimed design of the 205 Design Patent through the use of the F1 Fastener.

329.    On information and belief, in violation of 35 U.S.C. § 271(b), Defendants specifically intend to induce infringement of the 205 Design Patent by their customers and users of the F1 Fastener and have knowledge that the inducing acts would cause infringement or were willfully blind to the possibility that their inducing acts would cause infringement. As discussed earlier in this Complaint, Defendants have cited at least the 205 Design Patent, and various other

Stryker patents related to the Asserted Patents during prosecution of Defendants' own patent applications.

330.    On information and belief, at all relevant times, Defendants knew or were willfully blind to how the F1 Fastener infringes the 205 Design Patent. Defendants have been and are actively inducing infringement of the 205 Design Patent by actively and knowingly inducing third parties such as customers (e.g., hospitals, EMS providers, and EMS personnel) to commit acts that Defendants know constitute infringement of the 205 Design Patent.

331.    On information and belief, Defendants actively and knowingly intended to aid, abet, direct, encourage, or otherwise instruct such third parties by Defendants' offer for sale and sale of the F1 Fastener and instructions to infringe the 205 Design Patent. Defendants encourage infringement by customers at least by providing product promotional materials and guides, as discussed above, that instruct users to use the F1 Fastener. Defendants have and continue to specifically intend to induce infringement of the 205 Design Patent.

332.    On information and belief, despite Defendants' knowledge of the 205 Design Patent and knowledge that customers will necessarily infringe the 205 Design Patent when the F1 Fastener is used as instructed, Defendants have encouraged, and continue to encourage, infringement.

333.    Defendants also contribute to infringement of the 205 Design Patent by Defendants' customers in violation of 35 U.S.C. §271(c). On information and belief, Defendants were aware of the 205 Design Patent at all relevant times, as discussed above. Defendants sell and offer for sale within the United States the F1 Fastener knowing that they constitute a material part of the claimed inventions of the 205 Design Patent, knowing that the F1 Fastener is especially made or

especially adapted for use in infringing the 205 Design Patent, and knowing that the F1 Fastener is not a staple article or commodity of commerce suitable for substantial non-infringing use.

334.     Unless enjoined by this Court, Defendants will continue to infringe the 205 Design Patent and as a direct result the Stryker Plaintiffs will continue to suffer harm, including irreparable harm for which there is no adequate remedy at law. Accordingly, the Stryker Plaintiffs are entitled to injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

335.     The Stryker Plaintiffs have suffered and will continue to suffer damage as a direct and proximate result of Defendants' infringement of the 205 Design Patent. Thus, in addition to injunctive relief, the Stryker Plaintiffs are entitled to recover damages for such infringement pursuant to 35 U.S.C. § 284 in an amount to be proven at trial.

336.     The Stryker Plaintiffs, on information and belief, allege that Defendants have earned profits by virtue of its infringement of the 205 Design Patent. Stryker, in accordance with 35 U.S.C. § 289, is entitled to recover all profits received or otherwise achieved, directly or indirectly, by Defendants in connection with its manufacturing, importing, advertising and sales of F1 Fasteners.

337.     On information and belief, the infringement of the 205 Design Patent by Defendants has been and continues to be willful and deliberate.

338.     Defendants have committed and continue to commit all of the above acts of infringement without license or authorization from either of the Stryker Plaintiffs.

339.     On information and belief, Defendants have had knowledge of the 205 Design Patent and knowledge that the F1 Fastener is covered by the 205 Design Patent. As discussed earlier in this Complaint, Defendants have cited at least the 205 Design Patent, and various other Stryker patents related to the Asserted Patents during prosecution of Defendants' own patent

applications. Defendants have copied and made, offered for sale and sold the F1 Fastener knowing of the risk of infringement and/or in view of a risk of infringement that was sufficiently obvious that it should have been known to Defendants. Defendants' infringing actions have been and continue to be willful, entitling the Stryker Plaintiffs to increased damages pursuant to 35 U.S.C. § 284.

340. Defendants' egregious conduct justifies an increase of three times the damages to be assessed pursuant to 35 U.S.C. § 284, and further qualifies this action as an exceptional case supporting an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

## SEVENTH CAUSE OF ACTION
### (Infringement of U.S. D833,623)

341. The Stryker Plaintiffs incorporate the foregoing paragraphs by reference as though set forth fully herein.

342. Defendants have directly infringed and is directly infringing the 623 Design Patent by selling and/or offering to sell within the United States and/or importing into the United States the F1 Fastener embodying the invention defined by the 623 Design Patent in violation of 35 U.S.C. § 271(a) without authority of Stryker.

343. Defendants' F1 Fastener infringes the 623 Design Patent inasmuch as it has an overall visual appearance that is substantially the same as the overall visual appearance of the design claimed in the 623 Design Patent.

344. An ordinary observer or purchaser would find the overall appearance of the 623 Design Patent and F1 Fastener substantially similar. As shown below, the F1 Fastener includes key visual features from and is substantially similar in overall appearance to the design claimed in the 623 Design Patent.

| 623 Design Patent | F1 Fastener |
|---|---|





| 623 Design Patent | F1 Fastener |
|---|---|
| FIG. 6 | |
| FIG. 7 | |

345.    Defendants have also indirectly infringed and continue to indirectly infringe the claimed design of the 623 Design Patent by inducing infringement pursuant to 35 U.S.C. § 271(b) and/or contributing to infringement pursuant to 35 U.S.C. § 271(c).

346.    On information and belief, Defendants' customers directly infringe the 623 Design Patent and Defendants knowingly induce customers to use its F1 Fastener, including, for example, by promoting the F1 Fastener for use and providing customers with instructions for using them. For example, when the F1 Fastener is sold to Defendants' customers, such as hospitals, EMS providers, and EMS personnel, those customers infringe the claimed design of the 623 Design Patent through the use of the F1 Fastener.

347.    On information and belief, in violation of 35 U.S.C. § 271(b), Defendants specifically intend to induce infringement of the 623 Design Patent by their customers and users of the F1 Fastener and have knowledge that the inducing acts would cause infringement or were willfully blind to the possibility that their inducing acts would cause infringement. As discussed earlier in this Complaint, Defendants have cited at least the 623 Design Patent, and various other

Stryker patents related to the Asserted Patents during prosecution of Defendants' own patent applications.

348.     On information and belief, at all relevant times, Defendants knew or were willfully blind to how the F1 Fastener infringes the 623 Design Patent. Defendants have been and are actively inducing infringement of the 623 Design Patent by actively and knowingly inducing third parties such as customers (e.g., hospitals, EMS providers, and EMS personnel) to commit acts that Defendants know constitute infringement of the 623 Design Patent.

349.     On information and belief, Defendants actively and knowingly intended to aid, abet, direct, encourage, or otherwise instruct such third parties by Defendants' offer for sale and sale of the F1 Fastener and instructions to infringe the 623 Design Patent. Defendants encourage infringement by customers at least by providing product promotional materials and guides, as discussed above, that instruct users to use the F1 Fastener. Defendants have and continue to specifically intend to induce infringement of the 623 Design Patent.

350.     On information and belief, despite Defendants' knowledge of the 623 Design Patent and knowledge that customers will necessarily infringe the 623 Design Patent when the F1 Fastener is used as instructed, Defendants have encouraged, and continue to encourage, infringement.

351.     Defendants also contribute to infringement of the 623 Design Patent by Defendants' customers in violation of 35 U.S.C. §271(c). On information and belief, Defendants were aware of the 623 Design Patent at all relevant times, as discussed above. Defendants sell and offer for sale within the United States the F1 Fastener knowing that they constitute a material part of the claimed inventions of the 623 Design Patent, knowing that the F1 Fastener is especially made or

especially adapted for use in infringing the 623 Design Patent, and knowing that the F1 Fastener is not a staple article or commodity of commerce suitable for substantial non-infringing use.

352.     Unless enjoined by this Court, Defendants will continue to infringe the 623 Design Patent and as a direct result the Stryker Plaintiffs will continue to suffer harm, including irreparable harm for which there is no adequate remedy at law. Accordingly, the Stryker Plaintiffs are entitled to injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

353.     The Stryker Plaintiffs have suffered and will continue to suffer damage as a direct and proximate result of Defendants' infringement of the 623 Design Patent. Thus, in addition to injunctive relief, the Stryker Plaintiffs are entitled to recover damages for such infringement pursuant to 35 U.S.C. § 284 in an amount to be proven at trial.

354.     The Stryker Plaintiffs, on information and belief, allege that Defendants have earned profits by virtue of its infringement of the 623 Design Patent. Stryker, in accordance with 35 U.S.C. § 289, is entitled to recover all profits received or otherwise achieved, directly or indirectly, by Defendants in connection with its manufacturing, importing, advertising and sales of F1 Fasteners.

355.     On information and belief, the infringement of the 623 Design Patent by Defendants has been and continues to be willful and deliberate.

356.     Defendants have committed and continue to commit all of the above acts of infringement without license or authorization from either of the Stryker Plaintiffs.

357.     On information and belief, Defendants have had knowledge of the 623 Design Patent and knowledge that the F1 Fastener is covered by the 623 Design Patent. As discussed earlier in this Complaint, Defendants have cited at least the 623 Design Patent, and various other Stryker patents related to the Asserted Patents during prosecution of Defendants' own patent

applications. Defendants have copied and made, offered for sale and sold the F1 Fastener knowing of the risk of infringement and/or in view of a risk of infringement that was sufficiently obvious that it should have been known to Defendants. Defendants' infringing actions have been and continue to be willful, entitling the Stryker Plaintiffs to increased damages pursuant to 35 U.S.C. § 284.

358.    Defendants' egregious conduct justifies an increase of three times the damages to be assessed pursuant to 35 U.S.C. § 284, and further qualifies this action as an exceptional case supporting an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

### EIGHTH CAUSE OF ACTION
### (Infringement of U.S. D875,950)

359.    The Stryker Plaintiffs incorporate the foregoing paragraphs by reference as though set forth fully herein.

360.    Defendants have directly infringed and are directly infringing the 950 Design Patent by selling and/or offering to sell within the United States and/or importing into the United States the F1 Fastener embodying the invention defined by the 950 Design Patent in violation of 35 U.S.C. § 271(a) without authority of Stryker.

361.    Defendants' F1 Fastener infringes the 950 Design Patent inasmuch as it has an overall visual appearance that is substantially the same as the overall visual appearance of the design claimed in the 950 Design Patent.

362.    An ordinary observer or purchaser would find the overall appearance of the 950 Design Patent and F1 Fastener substantially similar. As shown below, the F1 Fastener includes key visual features from and is substantially similar in overall appearance to the design claimed in the 950 Design Patent.





| 950 Design Patent | F1 Fastener |
|---|---|

363.    Defendants have also indirectly infringed and continue to indirectly infringe the claimed design of the 950 Design Patent by inducing infringement pursuant to 35 U.S.C. § 271(b) and/or contributing to infringement pursuant to 35 U.S.C. § 271(c).

364.    On information and belief, Defendants' customers directly infringe the 950 Design Patent and Defendants knowingly induce customers to use its F1 Fastener, including, for example, by promoting the F1 Fastener for use and providing customers with instructions for using them. For example, when the F1 Fastener is sold to Defendants' customers, such as hospitals, EMS providers, and EMS personnel, those customers infringe the claimed design of the 950 Design Patent through the use of the F1 Fastener.

365.    On information and belief, in violation of 35 U.S.C. § 271(b), Defendants specifically intend to induce infringement of the 950 Design Patent by their customers and users of the F1 Fastener and have knowledge that the inducing acts would cause infringement or were willfully blind to the possibility that their inducing acts would cause infringement. As discussed earlier in this Complaint, Defendants have cited at least the 950 Design Patent, and various other

Stryker patents related to the Asserted Patents during prosecution of Defendants' own patent applications.

366.    On information and belief, at all relevant times, Defendants knew or were willfully blind to how the F1 Fastener infringes the 950 Design Patent. Defendants have been and are actively inducing infringement of the 950 Design Patent by actively and knowingly inducing third parties such as customers (e.g., hospitals, EMS providers, and EMS personnel) to commit acts that Defendants know constitute infringement of the 950 Design Patent.

367.    On information and belief, Defendants actively and knowingly intended to aid, abet, direct, encourage, or otherwise instruct such third parties by Defendants' offer for sale and sale of the F1 Fastener and instructions to infringe the 950 Design Patent. Defendants encourage infringement by customers at least by providing product promotional materials and guides, as discussed above, that instruct users to use the F1 Fastener. Defendants have and continue to specifically intend to induce infringement of the 950 Design Patent.

368.    On information and belief, despite Defendants' knowledge of the 950 Design Patent and knowledge that customers will necessarily infringe the 950 Design Patent when the F1 Fastener is used as instructed, Defendants have encouraged, and continue to encourage, infringement.

369.    Defendants also contribute to infringement of the 950 Design Patent by Defendants' customers in violation of 35 U.S.C. §271(c). On information and belief, Defendants were aware of the 950 Design Patent at all relevant times, as discussed above. Defendants sell and offer for sale within the United States the F1 Fastener knowing that they constitute a material part of the claimed inventions of the 950 Design Patent, knowing that the F1 Fastener is especially made or

especially adapted for use in infringing the 950 Design Patent, and knowing that the F1 Fastener is not a staple article or commodity of commerce suitable for substantial non-infringing use.

370.     Unless enjoined by this Court, Defendants will continue to infringe the 950 Design Patent and as a direct result the Stryker Plaintiffs will continue to suffer harm, including irreparable harm for which there is no adequate remedy at law. Accordingly, the Stryker Plaintiffs are entitled to injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

371.     The Stryker Plaintiffs have suffered and will continue to suffer damage as a direct and proximate result of Defendants' infringement of the 950 Design Patent. Thus, in addition to injunctive relief, the Stryker Plaintiffs are entitled to recover damages for such infringement pursuant to 35 U.S.C. § 284 in an amount to be proven at trial.

372.     The Stryker Plaintiffs, on information and belief, allege that Defendants have earned profits by virtue of its infringement of the 950 Design Patent. Stryker, in accordance with 35 U.S.C. § 289, is entitled to recover all profits received or otherwise achieved, directly or indirectly, by Defendants in connection with its manufacturing, importing, advertising and sales of F1 Fasteners.

373.     On information and belief, the infringement of the 950 Design Patent by Defendants has been and continues to be willful and deliberate.

374.     Defendants have committed and continue to commit all of the above acts of infringement without license or authorization from either of the Stryker Plaintiffs.

375.     On information and belief, Defendants have had knowledge of the 950 Design Patent and knowledge that the F1 Fastener is covered by the 950 Design Patent. As discussed earlier in this Complaint, Defendants have cited at least the 950 Design Patent, and various other Stryker patents related to the Asserted Patents during prosecution of Defendants' own patent

applications. Defendants have copied and made, offered for sale and sold the F1 Fastener knowing of the risk of infringement and/or in view of a risk of infringement that was sufficiently obvious that it should have been known to Defendants. Defendants' infringing actions have been and continue to be willful, entitling the Stryker Plaintiffs to increased damages pursuant to 35 U.S.C. § 284.

376. Defendants' egregious conduct justifies an increase of three times the damages to be assessed pursuant to 35 U.S.C. § 284, and further qualifies this action as an exceptional case supporting an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

## DEMAND FOR JURY TRIAL

Stryker demands a trial by jury under Rule 38 of the Federal Rules of Civil Procedure of all issues in this action so triable.

## PRAYER FOR RELIEF

WHEREFORE, the Stryker Plaintiffs respectfully pray for judgment in their favor against Defendants:

A. a judgment adjudging Defendants to have infringed each of the Asserted Patents pursuant to 35 U.S.C. §§ 271(a), (b), and/or (c);

B. an order that Defendants and each of their officers, employees, agents, attorneys, all of their parent, subsidiary, and affiliate corporations, other of their related business entities, and any persons in active concert, participation or in privity with one or more of the foregoing, and each of their successors and assigns, be permanently restrained and enjoined from continued acts of infringement of the Asserted Patents;

C. an award of damages sustained as a result of Defendants' infringement of the Asserted Patents in an amount to be determined at trial as provided pursuant to 35 U.S.C. § 284 that is adequate to compensate Stryker for Defendants' infringement;

D. an accounting from Defendants for all gains, profits, and advantages derived from acts of infringement and/or other violations of the law as alleged herein, including disgorgement of Defendants' profits pursuant to 35 U.S.C. § 289 in connection with the 205 Design Patent, the 623 Design Patent, and 950 Design Patent ("Stryker Design Patents");

E. an order requiring the impounding and destruction of all products infringing the Stryker Design Patents;

F. an order trebling damages pursuant to 35 U.S.C. § 284 as a result of Defendants' willful infringement;

G. a finding adjudging that this is an exceptional case pursuant to 35 U.S.C. § 285;

H. an award to Stryker of its costs and attorneys' fees and expenses in this action, as provided by 35 U.S.C. § 285;

I. an accounting for infringing sales not presented at trial and an award by the Court of additional damages for any such infringing sales;

J. an award of pre-judgment and post-judgment interest and costs; and

K. such other relief as this Court may deem proper and just under the circumstances.

Date: October 12, 2022                       Respectfully submitted,

THOMPSON HINE LLP

*/s/ Jesse Jenike-Godshalk*
Jesse Jenike-Godshalk
THOMPSON HINE LLP
312 Walnut Street, 20th Floor
Cincinnati, OH 45202-4024
(513) 352-6702
Jesse.Godshalk@ThompsonHine.com

*Attorneys for Stryker Corporation and*
*Stryker Sales, LLC*

OF COUNSEL:

Robert A. Surrette (*pro hac vice* forthcoming)
Deborah A. Laughton (*pro hac vice* forthcoming)
Michael S. Tomsa (*pro hac vice* forthcoming)
MCANDREWS, HELD & MALLOY, LTD.
500 West Madison Street
Chicago, Illinois 60661
Telephone: (312) 775-8000
bsurrette@mcandrews-ip.com
dlaughton@mcandrews-ip.com
mtomsa@mcandrews-ip.com